IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
February 3, 2005 Session

## STATE OF TENNESSEE v. KIMBERLY JEANNINE COX

**Appeal by permission from the Court of Criminal Appeals**
**Circuit Court for Montgomery County**
**No. 40200158      Michael R. Jones, Judge**

---

### No. M2002-01849-SC-R11-CD - Filed August 26, 2005

---

We accepted review of this cause under the Tennessee Rules of Appellate Procedure, Rule 11, in order to address a question properly preserved and certified pursuant to the provisions of the Tennessee Rules of Criminal Procedure, Rule 37(b)(2)(i).  The question, as certified, is:  Whether the consent given to search the defendant's motel room is consistent with the requirements of the United States Constitution and the Constitution of the State of Tennessee?

Because we hold that during the course of a lawful traffic stop the defendant voluntarily consented to a search of her motel room, we find the trial court was correct in denying the motion to suppress the evidence obtained as a result of that search.  Accordingly, we affirm the judgment of the Court of Criminal Appeals.

### Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed

ADOLPHO A. BIRCH, JR., J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and E. RILEY ANDERSON, JANICE M. HOLDER, and WILLIAM M. BARKER, JJ., joined.

Roger E. Nell, District Public Defender (on appeal), and Russel A. Church, Assistant Public Defender (at trial and on appeal), Clarksville, Tennessee, for the appellant, Kimberly Jeannine Cox.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Richard H. Dunavant, Assistant Attorney General; John Carney, District Attorney General; and Arthur Bieber, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

I.  Facts and Procedural History

On the morning of February 3, 2002, at approximately 12:15 a.m., Officer David Randall Odell, a drug enforcement agent attached to the Major Crimes Unit of the Clarksville Police Department, observed the defendant, Kimberly Cox, driving out of an exit near a business that had been burglarized several times recently. He followed the defendant in his unmarked vehicle until she entered the left turn lane. Thereafter, she failed to activate her left-turn signal before turning into a mobile home park. At this point, he activated his emergency equipment and pulled her over.

Upon approaching Cox's vehicle, Odell asked the defendant for her driver's license; she complied. Odell informed her he was going to check the validity of her license and determine whether she had any outstanding warrants. He stated that if she did not have any outstanding warrants, he intended to issue a verbal warning and let her go. Approximately five minutes later, Odell had determined that her license was valid and no warrants were outstanding against her. However, upon checking her license plate, Odell discovered that it was registered to a different vehicle. Odell called for back-up and asked the defendant to step out of the car.

When Odell asked the defendant about the discrepancy, she told him that she had borrowed the vehicle from a friend. At this time, three officers arrived in response to Odell's request for back-up. He then transmitted the vehicle identification number to his dispatcher to determine whether the vehicle had been stolen. While waiting for the results, Odell asked the defendant for permission to search both her person and the vehicle. She consented to both searches, which took about ten minutes. Odell discovered a seed and flake of marijuana on the driver's side floorboard; this evidence was not field testable.[1]

After finding the marijuana, Odell asked the defendant where she was going. She stated that she lived in a trailer at the mobile home park, and was going there to retrieve her mobile phone charger. She further explained that she and her boyfriend were staying at the Travel Inn because there were several people in her trailer. Odell then asked for permission to search her room at the Travel Inn, which was located about a quarter of a mile away. The defendant assented and gave Odell the number of the room where she and her boyfriend were staying. Odell returned the defendant's license, and then he and another officer followed the defendant to the Travel Inn. At this time, about twenty to twenty-five minutes had elapsed since the initial stop. As they entered the motel parking lot, Odell was told by the dispatcher that nothing indicated the defendant's vehicle had been stolen.

Upon arrival at the defendant's motel room, the defendant unlocked the door. Odell identified himself to John David Scott, a man present in the room, and explained why he was there. Scott immediately told Odell that he had a marijuana cigar and handed it to the officer. Odell asked Scott if he could search his person; Scott assented. Odell then asked if there were any weapons or other drugs in the room. Both the defendant and Scott replied in the negative.

---

[1] At some point during the encounter, Odell told the defendant that he would not charge her for the marijuana he found in the vehicle.

Odell advised the defendant and Scott of their <u>Miranda</u>[2] rights and told them that he was going to continue to search the motel room. While searching the room, Odell found a small tube in a night stand, which contained approximately eight pieces of what appeared to be crack cocaine. He then arrested both the defendant and Scott. The laboratory tests ultimately confirmed Odell's suspicions regarding the evidence he found. The defendant and Scott were each indicted for simple possession of marijuana, Tennessee Code Annotated section 39-17-418, possession of more than .5 grams of cocaine with intent to sell, Tennessee Code Annotated section 39-17-417, and possession of more than .5 grams of cocaine with intent to deliver, Tennessee Code Annotated section 39-17-417.

The defendant filed a motion to suppress the evidence obtained during the search of the motel room. After hearing testimony and argument, the trial court overruled the motion. In finding the consent to search the motel room voluntary, the trial court stated:

> Now the testimony was very, very clear from the officer that she agreed to the search of the motel room back at the initial stop. Basically, sure go ahead. And she wasn't detained from that point. She got into this other car and went with–drove the car to the motel and, basically, opened the door for the officer and said come on in and you can search, as she had already said.

> So, I think it's was [sic] very important that she was not being detained there to go search the motel room. She agreed to it. And, again, that's what the law is in this state is whether she agrees to it voluntarily, and she certainly did.

> And, again, if she had said no to that, that would have been the end of that. There wasn't any reasonable suspicion, any activity either for the car or for the motel room. But when you consent you take that out of the . . . consideration for the Court.

> I think under all the circumstances her consent was voluntary; it was intelligently made.

Thereafter, the defendant entered a plea of guilty to one count of possession of cocaine greater than .5 grams, and the trial court sentenced her to a term of eight years, all suspended, to run concurrently with a prior sentence. The remaining charges were dismissed.

In keeping with the agreement, the defendant reserved a certified question for appeal pursuant to Rule 37(b)(2)(i) of the Tennessee Rules of Criminal Procedure. The reserved question is: whether the consent given to search the defendant's motel room is consistent with the requirements of the United States Constitution and the Constitution of Tennessee. Within that reserved question the defendant states that there are four issues: (1) whether the trial court was correct that the consent was voluntarily given as that requirement exists under both constitutions; (2) whether the police have

---

[2]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

any requirement to discuss the voluntariness of consent–specifically the right to refuse; (3) whether there are any limitations on the ability of the police to seek a consent search under circumstances where any other exception to the search requirement does not exist; and (4) under the facts of this case, whether the request to search a motel room at another location as a result of a traffic stop that resulted in the issuance of no charges or citations, was a violation of the defendant's constitutional rights.

On direct appeal, the Court of Criminal Appeals affirmed the trial court's judgment. Now, we consider the same question pursuant to Rule 11 of the Tennessee Rules of Appellate Procedure. Although the four supplemental questions are posited as discrete issues, the determinative issue is the constitutional validity of the defendant's consent to the search of her motel room. The other questions are tangential and subordinate to this issue, and resolution of the determinative issue will, in turn, resolve the certified question.

## II. Standard of Review

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. at 23. As is customary, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews de novo the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999).

## III. Analysis

### A. Search and Seizure

The Fourth Amendment to the United States Constitution guarantees that "the right of the people to be secure . . . against unreasonable searches and seizures, shall not be violated and no warrants shall issue, but upon probable cause . . . ."[3] Similarly, Article I, section 7 of our Tennessee Constitution guarantees "that the people shall be secure in their persons, houses, papers, and possessions, from unreasonable searches and seizures . . . ." The purpose of these constitutional provisions protecting the citizenry from unreasonable searches and seizures is to "safeguard the privacy and security of individuals against arbitrary invasions of government officials." State v. Randolph, 74 S.W.3d 330, 334 (Tenn. 2002) (quoting Camara v. Mun. Ct. of San Francisco, 387 U.S. 523, 528 (1967)).

---

[3]The Fourth Amendment is applicable to the states through the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643 (1961).

Accordingly, under both the federal constitution and our state constitution, a search without a warrant is presumptively unreasonable, and any evidence obtained pursuant to such a search is subject to suppression unless the state demonstrates that the search was conducted under one of the narrowly defined exceptions to the warrant requirement. State v. Garcia, 123 S.W.3d 335, 343 (Tenn. 2003) (citing State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997) and Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971)); see also Katz v. United States, 389 U.S. 347, 357 (1967); State v. Bartram, 925 S.W.2d 227, 229-230 (Tenn. 1996). Moreover, Tennessee has approved of and adopted exceptions to the requirement of obtaining a valid search warrant, including search incident to arrest, plain view, stop and frisk, hot pursuit, search under exigent circumstances, and others. Bartram, 925 S.W.2d 227, 230 & n.2. Well settled among the exceptions to the warrant requirement, and the one with which we are engaged here, is consent to search. See id. at 230.

### B. Consent to Search

### 1. Scope of the Stop

First, the defendant contends that the scope of the officer's actions during the stop exceeded constitutional parameters. Specifically, it is settled law that "the temporary detention of individuals during the stop of a vehicle by police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' which implicates the protection of both the state and federal constitutional provisions." State v. Vineyard, 958 S.W.2d 730, 734 (Tenn. 1997) (citing Whren v. United States, 517 U.S. 806, 809-10 (1996), Delaware v. Prouse, 440 U.S. 648, 653 (1979), and State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993)). As a general rule under both the state and federal constitutions, if the police have probable cause to believe that a traffic violation has occurred, such stops are considered constitutionally reasonable. Whren, 517 U.S. at 810; Vineyard, 958 S.W.2d at 734. The duration of such a stop, however, must be "temporary and last no longer than necessary to effectuate the purpose of the stop." State v. Troxell, 78 S.W.3d 866, 871 (Tenn. 2002) (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)); see also Terry v. Ohio, 392 U.S. 1, 20 (1968) (holding that an officer's actions in an investigative stop must be "reasonably related in scope to the circumstances which justified the interference in the first place"). "The proper inquiry is whether during the detention the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." Troxell, 78 S.W.3d at 871; see United States v. Sharpe, 470 U.S. 675, 686 (1985). A traffic stop may be deemed "unreasonable," if the "'time, manner or scope of the investigation exceeds the proper parameters.'" Troxell, 78 S.W.3d at 871 (quoting United States v. Childs, 256 F.3d 559, 564 (7th Cir. 2001) and citing State v. Morelock, 851 S.W.2d 838, 840 (Tenn. Crim. App. 1992)).

In this case, Odell stopped the defendant for a traffic infraction. He asked for her driver's license for the purpose of confirming its validity. Such conduct is clearly permissible within the scope of a traffic stop under Tennessee law. Tenn. Code Ann. § 55-50-804; State v. McCulloch, 906 S.W.2d 3, 5 (Tenn. Crim. App. 1995). Although Odell determined that the driver's license was valid, he also learned that the license plate on the vehicle was registered to a different vehicle. It was not unreasonable for Odell to retain the defendant's driver's license as he continued to confirm that

the vehicle the defendant was driving was legitimately in her possession. The detention, under the circumstances, was no longer than was necessary. The process of checking the validity of the driver's license, checking for outstanding warrants, and then checking the vehicle identification number to ensure the vehicle was not stolen, lasted approximately fifteen minutes. During this entire period of time, Odell continued to diligently pursue the investigation in a manner designed to confirm or dispel suspicion quickly. See Troxell, 78 S.W.3d at 871. We conclude that the scope of the investigative detention was reasonable. Accordingly, the defendant's contention that her consent was obtained as a result of an unlawful detention is without merit.

## 2. Reasonable Suspicion Requirement to Seek Consent

The defendant also urges this Court to attach to consent searches a requirement limiting law enforcement personnel to requesting the consent to search only in instances where, at a minimum, the officer has a reasonable suspicion, supported by specific and articulable facts, that contraband or other evidence of a crime will be found during the course of the search. She cites to our decision in State v. Daniel, 12 S.W.3d 420 (Tenn. 2000), in which we limited the discretion of law enforcement officers to "seize" a citizen without reasonable suspicion by asking for and then retaining the citizen's driver's license in order to run a warrants check.[4]

The defendant in Daniel was standing with friends in the parking lot of a Knox County convenience store at dusk on a summer night. Id. at 423. The men were approached by a police officer who asked to see identification. Id. The State conceded that the officer had no reasonable suspicion to believe that a crime had been, or was about to be, committed. Id. at 428. The officer took the defendant's driver's license and retained it for some period of time while running a warrants check on the men. Id. at 423. As it turned out, there was an outstanding warrant on the defendant. Id. He was arrested and incident to that arrest, when the officer asked the defendant if he had anything sharp in his pockets, he revealed that he had a bag of marijuana. Id. The defendant was then charged with possession of the marijuana.

We pointed out in Daniel that there are three types of police-citizen interactions: full scale arrests, which require probable cause; brief investigatory detentions, which require reasonable suspicion of wrongdoing; and the brief police-citizen encounters, which require no objective justification. Id. at 424 (citations omitted). In Daniel, we found that what began as a brief encounter ripened into a detention when the defendant's license was retained to run a records check. Because such detentions require reasonable suspicion, and because the officer in that case had none, we held that the detention was illegal and that the marijuana, as the fruit of that detention, should have been suppressed. Id. at 428 (citing Wong Sun v. United States, 371 U.S. 471, 488 (1963)).

---

[4]The defendant cites to the concurring opinion in Daniel, which would have held that the mere approach of the officer and request for identification constituted a "seizure." Id. at 429 (Byers, S.J, & Birch, J., concurring and dissenting). The majority opinion, however, did not expand the definition of "seizure" to include a simple request for identification, but relied on the fact that the officer did not immediately return the driver's license, instead retaining it for a period of time to run the records check.

The facts in this case are distinguishable from Daniel. First, Odell clearly had probable cause to stop the defendant for her traffic infraction. Second, although he determined not to cite her for that infraction, the detention was thereafter justified by the discrepancy in the status of the vehicle license registration. Accordingly, the consent to search the car and consent to search the motel room were not "fruit of the poisonous tree" as in Daniel.

The defendant also cites to a New Jersey case, State v. Carty, 790 A.2d 903 (N.J. 2002), in which the Supreme Court of New Jersey held that consent to search following the lawful stop of a motor vehicle would not be deemed valid unless there was a reasonable and articulable suspicion that the motorist or passenger has engaged in, or is about to engage in, criminal activity. Id. at 912.[5] As far as we have been able to discern from our extensive research on this issue, only one other state, New York, has imposed such a requirement on consent searches. See People v. Hollman, 590 N.E. 2d 204 (N.Y. 1992).[6] We do not believe that such a requirement is necessary. As previously noted, we find that the "totality of the circumstances" test for determining voluntariness of consent adequately safeguards the constitutional protections provided by Article I, section 7 of our own constitution as well. Accordingly, we decline to impose any additional requirements for consent searches.

Furthermore, we note the defendant's contention that the initial traffic stop was pretextual and unsupported by probable cause or reasonable suspicion. As the state points out, however, the defendant did not include the issue of the validity of the initial traffic stop within the certified question.[7] Accordingly, the question not having been reserved under Rule 37 (b)(2)(i), Rules of Criminal Procedure, we do not address it here. State v. Preston, 759 S.W.2d 647, 650 (Tenn. 1988).

### 3. Knowledge of the Right to Refuse Consent

Finally, the defendant urges that consent cannot be "intelligently given" unless a subject is expressly informed that he or she has the right to refuse consent. "'Voluntary consent requires sufficient intelligence to appreciate the act as well as the consequence of the act agreed to.'"

---

[5]The Carty court also held that the appearance of nervousness alone is not sufficient grounds to support a finding of reasonable and articulable suspicion.

[6]The New York Court of Appeals based their decision on state common law, not constitutional grounds. Hollman, 590 N.E.2d at 912-13.

[7]In any event, it appears that this issue is meritless. The traffic stop was made after the defendant had committed a traffic infraction in failing to use her turn signal. See Tenn. Code Ann. §§ 55-8-142 and -143 (requiring that turn signals be used to indicate turns if other traffic may be affected by the movement). The testimony at the suppression hearing indicated that there was an oncoming car that could have been affected by her turn. Likewise, as he was following her, Odell could have been affected by the turn.

Thurman v. State, 455 S.W.2d 177, 180 (Tenn. Crim. App. 1970) (quoting 79 C.J.S. Searches and Seizures § 62(b)).[8]

Indeed, the United States Supreme Court has expressly held that an individual need not be informed of his or her right to refuse consent as a prerequisite of valid consent. United States v. Drayton, 536 U.S. 194, 206 (2002); Schneckloth v. Bustamonte, 412 U.S. 218, 231 (1973). The facts in Schneckloth were similar to those in this case. The defendant, Robert Bustamonte, was one of five passengers in a vehicle that was stopped by police for various minor traffic infractions. Schneckloth, 412 U.S. at 220. Neither the driver nor four of the passengers could produce any identification. Id. Joe Alcala, the one passenger who did have identification, told police that the car belonged to his brother. Id. Police then asked Alcala for permission to search the car, and Alcala agreed. Id. Three stolen checks were discovered under the rear passenger seat of the car. Id.

On appeal, the Court of Appeals for the Ninth Circuit held that the state must demonstrate that a person knew and understood that their consent could have been withheld. Id. at 221. The Schneckloth court expressly rejected this reasoning, refusing to impose upon the State the burden of showing that there had been an intentional relinquishment of a known constitutional right. Id. at 249. Instead, the court simply reiterated that the question of consent was to be analyzed under the "voluntariness" standard and determined from a consideration of the totality of the circumstances. Id. at 235-247; see also Drayton, 536 U.S. at 206.[9] The intermediate court of this state has consistently rejected the notion that a suspect must be expressly informed of the right to refuse consent and, as indicated, this Court has denied permission to appeal. See State v. Vaughan, 144 S.W.3d 391, 403 (Tenn. Crim. App. 2003); State v. Cothran, 115 S.W.3d 513, 522 (Tenn. Crim. App. 2003), perm. app. denied (Tenn. 2003). Likewise, the majority of states have rejected this argument as well. See State v. Smith, 599 P.2d 187, 197 (Ariz. 1979); People v. Helm, 633 P.2d 1071, 1076-77 (Colo. 1981); State v. Tye, 580 S.E.2d 528, 530 (Ga. 2003); State v. Reinders, 690 N.W.2d 78, 82 (Iowa 2004); State v. Berry, 526 S.W.2d 92, 98 (Mo. Ct. App. 1975); State v. Osborne, 402 A.2d 493, 498 (N.H. 1979); State v. Robinette, 685 N.E.2d 762, 769 (Ohio 1997); State v. Flores, 570 P.2d 965, 969-70 (Or. 1977); Commonwealth v. Cleckley, 738 A.2d 427, 432-33 (Pa. 1999); State v. Castleberry, 686 N.W.2d 384, 387 (S.D. 2004); In re D.G., 96 S.W.3d 465, 468-69 (Tex. App. 2002); State v. Contrel, 886 P.2d 107, 111-12 (Utah Ct. App. 1994); Barkley v. Commonwealth, 576 S.E.2d 234, 241 (Va. Ct. App. 2003); State v. McCrorey, 851 P.2d 1234, 1239 (Wash. Ct. App. 1993), overruled on other grounds; State v. Buzzard, 461 S.E.2d 50, 57 (W. Va. 1995); State v. Williams, 646 N.W.2d 834, 840 n.7 (Wis. 2002).

---

[8]This language is deleted in the current edition. The current C.J.S. citation discussing the criteria for voluntariness of consent is 79 C.J.S. Searches and Seizures § 119(a) (1995 & Supp. 2004).

[9]Justices Brennan and Marshall dissented in Schneckloth, articulating their view that the burden should be on the state to demonstrate knowledge on the part of the person involved that he or she had a choice in the matter. Justice Brennan stated that he was unable to comprehend how a citizen can waive a right of which he is unaware and outlined several ways in which the state might satisfy its burden.

We acknowledge, however, that Schneckloth and its progeny have been rejected as ruling precedent in a handful of jurisdictions. See Graves v. State, 708 So.2d 858, 863-64 (Miss. 1997); State v. Carty, 790 A.2d 903, 907 (N.J. 2002) (holding that suspects must be advised of their right to refuse consent to search); see generally State v. Trainor, 925 P.2d 818, 826-831 (Haw. 1996). The rationale for this rejection has several common threads:

1)      Many persons would view a request from police to conduct a search as having the force of law;

2)      Unless it is shown that the subject knew of the right to refuse to consent to the search, the consent given is not meaningful; and,

3)      One cannot be held to have waived a right if unaware of its existence.

The distinction between the Schneckloth analysis of voluntariness and the minority view is at once apparent. Schneckloth requires that consent be analyzed within the totality of the circumstances surrounding the giving of that consent. Under this analysis, whether the subject knew of the right to refuse consent is but one factor to be considered. In contrast, those who reject Schneckloth urge a per se rule based upon a "waiver" analysis. Under this analysis, failure on the part of the state to demonstrate a subject's awareness of a choice in the matter (i.e., the right to refuse) is key. As a result of failure to demonstrate this knowledge, the consent would be deemed unconstitutional regardless of the other attendant circumstances.

We are free to interpret the provisions of our state constitution to afford greater protection than the federal constitution. Indeed, in the search and seizure arena, we acknowledge that on occasion this Court has applied a common sense "reasonableness" standard that tends to provide greater protection for the constitutional rights of citizens than the baseline level of protection guaranteed by the federal constitution. See, e.g., State v. Randolph, 74 S.W.3d 330, 337 (Tenn. 2002) (applying a "totality of the circumstances" test to determine when a "seizure" occurs, a broader test than that applied by the federal courts); State v. Hicks, 55 S.W.3d 515, 538-39 (Tenn. 2001) (holding that driver's license roadblocks are unconstitutional under Tennessee Constitution Article I, section 7); State v. Jacumin, 778 S.W.2d 430, 436 (Tenn. 1989) (adopting a stricter test for ascertaining probable cause for informant-based warrants).

In the case of consent searches, however, we believe the totality of the circumstances test adequately balances the government's interest in pursuing criminal investigations against the citizen's right to be free from unreasonable searches and seizures. The very nature of a consent search differs from the other exceptions to the warrant requirement; a subject approached regarding a consent search is presumed free to decline the request. Thus, the defendant may adduce proof tending to show that he or she was not "free" to decline the request to search.

Schneckloth remains the majority rule despite the occasional efforts to scuttle it. Accordingly, we decline to impose a requirement that the subject be informed of the right to refuse

consent. Instead, we continue to adhere to the Schneckloth totality of the circumstances criteria, which may specifically include a subject's knowledge of the right to refuse consent. Therefore, we decline to adopt a per se rule or a waiver analysis in these circumstances.

4. Totality of the Circumstances

The issue of consent under the United States Constitution, is analyzed under the standard set forth in Schneckloth:

> [T]he Fourth and Fourteenth Amendments [to the United States Constitution] require that a consent not be coerced by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed.

412 U.S. at 228. Furthermore, while "[t]he Fourth Amendment proscribes unreasonable searches and seizures, it does not proscribe voluntary cooperation." Florida v. Bostick, 501 U.S. 429, 439 (1991); Schneckloth v. Bustamonte, 412 U.S. 218, 243 (1973) (holding that "there is nothing constitutionally suspect in a person[] voluntarily allowing a search"). We believe the same is true under Article I, section 7 of our own constitution. See Bartram, 925 S.W.2d at 229-30.

Thus, "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth, 412 U.S. at 227. To clarify its rationale, the Court in Schneckloth explains:

> The problem of reconciling the recognized legitimacy of consent searches with the requirement that they be free from any aspect of official coercion cannot be resolved by any infallible touchstone. To approve such searches without the most careful scrutiny would sanction the possibility of official coercion; to place artificial restrictions upon such searches would jeopardize their basic validity . . . . [T]he requirement of a 'voluntary' consent reflects a fair accommodation of the constitutional requirements involved. In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents . . . . In sum, there is no reason for us to depart in the area of consent searches, from the traditional definition of 'voluntariness.'

Id. at 229.

Likewise, consent is similarly analyzed under Tennessee law. For consent to pass "constitutional muster," it must be "unequivocal, specific, intelligently given, and uncontaminated

-10-

by duress or coercion." State v. Simpson, 968 S.W.2d 776, 784 (Tenn. 1998) (quoting State v. Brown, 836 S.W.2d 530, 547 (Tenn. 1992)). Like the Schneckloth court, the Court of Criminal Appeals has held that "[t]he existence of consent and whether it was voluntarily given are questions of fact" which require examining the totality of the circumstances. State v. Ashworth, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999) (quoting State v. McMahan, 650 S.W.2d 383, 386 (Tenn. Crim. App. 1983) and citing Schneckloth, 412 U.S. at 248-49); see also State v. McCrary, 45 S.W.3d 36, 43 (Tenn. Crim. App. 2000); State v. Jackson, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993). Accordingly, we analyze the voluntariness of consent in this case under the totality of the circumstances criteria.

The question of whether a particular consent to search was "voluntary" is fact-specific to each case. The United States Supreme Court has consistently rejected a "bright-line test." Ohio v. Robinette, 519 U.S. 33, 39 (1996); Schneckloth, 412 U.S. at 229-30. The pertinent question is this: whether the defendant's act of consenting is the product of an essentially free and unconstrained choice. If the defendant's will was overborne and his or her capacity for self-determination critically impaired, due process is offended. Schneckloth, 412 U.S. at 225-26 (citing Culombe v. Connecticut, 367 U.S. 568, 602 (1961)).

In evaluating the voluntariness of consent, factors to consider may include:

1.      Time and place of the encounter;

2.      Whether the encounter was in a public or secluded place;

3.      The number of officers present;

4.      The degree of hostility;

5.      Whether weapons were displayed;

6.      Whether consent was requested; and

7.      Whether the consenter initiated contact with the police.

79 C.J.S. Searches and Seizures § 119(b) (1995 & Supp. 2004); see also State v. Carter, 16 S.W.3d 762, 769 (Tenn. 2000). Moreover, consideration may be given to certain personal characteristics of the individual giving consent. These include: "age, education, intelligence, knowledge, maturity, sophistication, experience, prior contact with law enforcement personnel, and prior cooperation or refusal to cooperate with law enforcement personnel." Id. Knowledge of the right to refuse consent has also been included as a factor. Schneckloth, 412 U.S. at 235-47

Using the factors applicable to the present case, we begin examining the totality of the circumstances by first considering the defendant's personal characteristics. The defendant was

twenty years of age at the time of the encounter. The record suggests that the defendant is of average intelligence. Furthermore, there does not appear to be any problem with the defendant's maturity or sophistication. The record includes a previous experience with law enforcement; according to the defendant's testimony at the suppression hearing, she had previously been through a similar investigatory stop and search of her vehicle.[10] Additionally, she had been incarcerated on a felony conviction and was still on probation at the time of this stop. This fact evinces a presumptive familiarity with the criminal justice system.

Next, the evaluation of the totality of circumstances turns to the details of the encounter. Since the encounter began at approximately 12:15 a.m., it appears from the record that the area where this incident occurred was virtually deserted. The defendant was turning into her mobile home park and was in familiar surroundings. Furthermore, the verbal exchanges between Odell and the defendant suggested a casual conversation. However, underlying that "friendly" attitude on Odell's part, there appeared to be a persistent yet subtle predetermination to exploit the defendant's apparent pleasantness and/or naivete. Additionally, the evidence indicates that Odell's specific job assignment was drug interdiction. This fact permits the inference that his focus was just that–drug interdiction.

Still, the evidence is that Odell remained polite and respectful throughout the encounter. Three other officers arrived on the scene after discovery of the license plate irregularity, but nothing in their conduct or in Odell's, for that matter, suggested pressure or coercion. Additionally, nothing in the record suggests that Odell drew his weapon at any point. Furthermore, after the defendant agreed to a search of the motel room, Odell returned her driver's license and permitted her to drive her own vehicle to the motel. In theory, had she entertained second thoughts about permitting the search, she had every opportunity to change her mind and revoke her consent upon arrival at the motel.[11] She did not do so.

Considering the totality of the circumstances, we are constrained to conclude that the defendant's consent was not obtained through coercion or intimidation. Rather, the record is remarkable in that the defendant appears to have eagerly cooperated with Odell, as evidenced by her words and conduct. Thus, the defendant's consent was voluntary.

IV. Conclusion

We conclude that under the facts of this case, the defendant was lawfully detained for a traffic infraction that was lawfully extended as police attempted to resolve a discrepancy in the vehicle

---

[10]The defendant testified that in this prior stop, officers told her she did not have a choice in the search of the car. The trial court, however, questioned the defendant's credibility on this matter.

[11]People v. Powell, 502 N.W.2d 353, 356 (Mich. App. 1993) (citing Florida v. Jimeno, 500 U.S. 248 (1991)) (holding consent may be withdrawn prior to a search's completion stating "[t]he United States Supreme Court has noted that a suspect may limit the scope of the consent given to conduct a search."); see generally, State v. Garcia, 123 S.W.3d 335, 343 (Tenn. 2003) (the defendant signed consent form which stated the right to revoke consent).

license registration. During this lawful detention, the defendant freely, intelligently, and voluntarily gave police consent–first to search the car she was driving and then her motel room. Thus, we conclude that the evidence found in the motel room was lawfully seized. We have concluded that the search conducted in this case has withstood constitutional scrutiny. We do not intend to give blanket approval to "off-site" searches such as we have here and will continue to scrutinize such searches. Thus, we expressly limit our holding to the facts of this case. We affirm the judgment of the Court of Criminal Appeals holding that consent was voluntarily obtained, and was, therefore, valid. It appearing that Kimberly Jeannine Cox is indigent, costs are taxed to the State of Tennessee, for which execution may issue if necessary.

_____
ADOLPHO A. BIRCH, JR., JUSTICE