FILED

08/05/2024

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 16, 2024 Session

**STATE OF TENNESSEE v. TARA D. ALLEN**

**Appeal from the Circuit Court for Cheatham County**
**No. 18491    Larry J. Wallace, Judge**

_____

**No. M2023-00868-CCA-R3-CD**

_____

The defendant, Tara Allen, was found guilty by a Cheatham County jury of vehicular homicide by intoxication and possession of drug paraphernalia. The trial court imposed an effective ten-year sentence. On appeal, the defendant contends the trial court erred in denying her motion to suppress evidence obtained from a warrantless blood draw. The defendant also argues the evidence presented at trial was insufficient to support her conviction of possession of drug paraphernalia. Following our review, the parties' briefs, and oral arguments, we affirm the defendant's convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and JILL BARTEE AYERS, JJ., joined.

M. Todd Ridley, Assistant Public Defender, Tennessee District Public Defenders Conference, Franklin, Tennessee, (on appeal) and Rob McKinney, Nashville, Tennessee, (at trial) for the appellant, Tara Dawn Allen.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Ray Crouch, Jr., District Attorney General; and Jack Arnold and Margaret Sagi, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The defendant, Tara Allen, was indicted in a two-count indictment by a Cheatham County grand jury for vehicular homicide by intoxication and possession of drug paraphernalia. The defendant filed a motion to suppress evidence seized from a warrantless blood draw. Following a hearing, the trial court denied the defendant's motion to suppress.

At trial, the defendant was convicted as charged for which she received an effective ten-year sentence. In this appeal as of right, the defendant contends that: 1) the trial court erred by denying defendant's motion to suppress; and 2) the evidence was insufficient to sustain her conviction of possession of drug paraphernalia. Having reviewed the record, briefs of the parties, and oral arguments, we conclude the trial court erred in denying the defendant's motion to suppress the results of the warrantless blood draw; however, the error was harmless. Additionally, we conclude the evidence was sufficient to sustain a conviction for possession of drug paraphernalia.

### *Facts and Procedural History*

On November 25, 2017, the defendant, driving at a speed approximately twice the speed limit, crossed the center line and struck Cynthia Heine's vehicle. Ms. Heine was ejected from her vehicle and died at the scene.

### I.     Motion to Suppress Evidence from Warrantless Blood Draw

In December 2018, the defendant moved to suppress the results of a warrantless blood draw taken in the hospital after the crash. The defendant asserted that the blood draw violated her constitutional right against unreasonable searches and seizures. *See* U.S. const. amend. IV; Tenn. const. art. 1, § 7. The defendant argued she had no memory of giving her consent to the blood draw, and any consent she may have given was invalid because she lacked the requisite mental capacity. The defendant relied on the following facts to establish she did not have the mental capacity to voluntarily consent to the blood draw: (1) she had been administered fentanyl by the hospital prior to giving verbal consent, (2) she had suffered head injuries related to the car accident, and (3) her speech was described by the law enforcement officer as "mumbled and incoherent." The State submitted that the defendant gave repeated verbal consent to the blood draw and that her consent was knowing and voluntary.

On September 7, 2021, the trial court held a hearing on the motion.[1]

The State called Lieutenant Kevin Smith of the Tennessee Highway Patrol ("THP") to testify. Lt. Smith stated that on November 25, 2017, he was dispatched to Skyline Medical Center to speak with a driver involved in a fatality crash "to determine if there

---

[1] The hearing on the defendant's motion to suppress was combined with a separate motion to suppress evidence of a second blood draw that occurred at approximately the same time as the one at issue here. The second blood draw was taken for medical purposes, and the sample was seized pursuant to a valid search warrant. The trial court denied the motion to suppress the second blood draw, and the defendant has not appealed that decision. Therefore, we will not address the facts and procedural history related to the second blood draw.

was any impairment." Prior to arriving at Skyline, Lt. Smith spoke with Tennessee State Trooper Jeff Barber, one of the officers on-scene at the crash site. Trooper Barber relayed that he "observed an odor of alcohol" while the defendant was being treated in the ambulance.

When Lt. Smith arrived at Skyline, the defendant was undergoing imagery to determine her injuries. After the defendant returned to her room, she was immobilized in a neck brace. Lt. Smith attempted to interview her to "understand the situation that had unfolded that day." However, Lt. Smith testified that the defendant's speech was "indiscernible" and "mumbling." After briefly exiting the room to speak with an assistant district attorney by telephone, Lt. Smith, again, attempted to speak with the defendant. However, "nothing identifiable came out of that." Lt. Smith stepped out of the room again. Lt. Smith testified he was out of the room for approximately 15 to 20 minutes while on the telephone with another assistant district attorney. During this time, Lt. Smith observed a phlebotomist enter the defendant's room.

While, upon re-entering the room, Lt. Smith heard the defendant identify herself to a nurse, the defendant remained nonresponsive to his questions concerning the crash. Lt. Smith stated that the defendant "pretty much kind of ignored me at that point." Despite the defendant's lack of communication and interaction with Lt. Smith, he asked the defendant, "if she would consent to a blood draw for legal purposes." Lt. Smith testified that the defendant answered "yes." In order to have a witness, Lt. Smith asked a nurse to join him in the defendant's room. Lt. Smith repeated his request to perform a blood draw "for legal purposes." Lt. Smith testified that the defendant said "yes" a second time and shook her head in the affirmative. The nurse also asked the defendant if she consented to a blood draw, and the defendant said "yes." Accordingly, the nurse performed the blood draw and gave two vials of the defendant's blood to Lt. Smith.

Lt. Smith testified that during this encounter, the defendant was not under arrest or handcuffed and described their exchange as "cordial." While Lt. Smith testified that he did not administer any assessment to determine if the defendant was competent, he stated that he had "no doubt that the defendant understood him" because "she was speaking" to him. Lt. Smith also testified that he did not advise the defendant of her right to refuse the blood draw and did not seek the defendant's signature on an Implied Consent Form due to her immobilization in the neck brace. Lt. Smith also acknowledged that he was aware the defendant had been administered fentanyl and described fentanyl as a "powerful" drug.

The defendant testified that when she awoke three days after the collision, she had no memory of what had happened or of speaking with a law enforcement officer. She testified that she had been advised by a neurologist that she could not recover the memory because she "received a front lobe concussion." The defendant conceded that on three

occasions, prior to the collision, she had refused consent to a blood test or breathalyzer, and thus, she did understand that she had the right to refuse the blood draw.

After taking the motion under consideration, the trial court issued a written order denying the defendant's motion to suppress. In the order, the trial court found that the defendant "gave consent for the blood draw three different times and was *essentially coherent* during those times." (emphasis added). The trial court also found "there was no evidence present[ed] that there was any coercive conduct on the part of law enforcement . . . the defendant was not restrained, under arrest or in custody." Additionally, the trial court noted that "intoxication will not in itself void a valid consent."

## II.  Trial

At trial, the evidence established that around 3:00 pm on November 25, 2017, Cynthia Heine was driving along Triangle Road to meet her daughter. Ms. Heine was traveling at a very low speed and was not wearing a seatbelt. Melanie Vuocolo, driving the same road, heard a "big boom" before coming upon the accident scene. Ms. Vuocolo placed a call to 911 and attempted to administer aid to the drivers of the vehicles. She testified that the defendant "was moving, so I knew she was alive. So, I went to the other lady who wasn't." Sandra Cowan, from the front yard of her residence, heard a "huge pop" and saw "something turned upside down." When she approached the vehicles, Ms. Cowan attempted to assist the defendant, "looking to stabilize if there was any neck injury or anything like that." Ms. Cowan testified that when she was with the defendant, she did not smell alcohol.

While being treated in the ambulance, the defendant was observed by two THP officers, Trooper Corey Brock and Sergeant Jeff Barber. Trooper Brock heard the defendant making noises of "pain and agony," as well as noticed a pungent, stale order of alcohol emanating from the back of the ambulance. Sgt. Barber attempted to speak with the defendant, but "communication was unsuccessful," and "[s]he was incoherent, babbling, muttering." Sgt. Barber also testified that he smelled a pungent odor from the ambulance that was "possibly [an] alcoholic beverage."

Lieutenant Kevin Smith also testified at trial. His testimony was largely consistent with the testimony he offered during the hearing on the defendant's motion to suppress. In addition to his testimony described above, Lt. Smith also stated that he did not tell the defendant her blood was going to be searched, but only that it was for "legal reasons." Lt. Smith also wrote in his notes that at the time the defendant consented to the blood draw, she had been administered 15 micrograms of fentanyl.

- 4 -

After Lt. Smith received the blood drawn pursuant to his request for consent, he sought a search warrant for a separate blood draw, one previously performed by the hospital for medical purposes. Once the search warrant was granted, Lt. Smith seized the blood drawn for medical purposes and delivered the samples from both blood draws to the Tennessee Bureau of Investigation's ("TBI") Crime Lab for analysis.

The blood samples taken from the defendant during both blood draws were analyzed for alcohol content by Agent Sarah Douglass, an expert in forensic toxicology and blood alcohol analysis with the TBI's Nashville Crime Lab. Agent Douglass testified that the defendant's blood alcohol content was above the legal limit. Specifically, the blood alcohol content of the sample from the warrantless blood draw was 0.143 gram percent ethyl alcohol, and the blood alcohol content of the medical blood draw was 0.156 gram percent. Agent Douglass also testified that the legal limit in Tennessee is 0.08 gram percent and that generally, the effect of the alcohol in the human body would lengthen reaction time and decrease inhibitions, leading to riskier decisions.

The defendant's blood samples were also analyzed for drug toxicology by Agent Matthew Buck, a forensic scientist with the TBI. Agent Buck's analysis of the warrantless blood draw revealed that Delta-9 tetrahydrocannabinol (THC) and morphine were present in the defendant's blood.[2] Agent Buck testified that morphine depresses the activity of the central nervous system creating a slower reaction time and a decrease in critical thinking skills. He also testified that THC and morphine are psychoactive substances that can alter perception of time and distance.

As part of the investigation of the collision, Trooper Brock initiated a search of the defendant's 2000 Chevy Malibu to find her driver's license. During the search, Trooper Brock discovered a credit card holder. Inside the credit card holder was a red drinking straw that had been cut into three pieces. Trooper Brock testified that in his experience, the straw was "indicative of narcotic use" to ingest drugs nasally, but he did not have the straws tested for drugs or for the defendant's DNA.

Rickey Alexander, a trooper with the THP's Critical Incident Response Team, testified as to his search and investigation of both vehicles. Pursuant to a search warrant, Trooper Alexander discovered two pill bottles, the fragmented straw, a razor blade, and a small container inside the defendant's vehicle. One pill bottle contained oxymorphone, an opiate, prescribed to Michael Griggs, and the second contained Gabapentin, prescribed to the defendant. Trooper Alexander testified that, in his experience, the cut drinking straw was "commonly used in the capacity to inhale powdery pills, substances and so forth,"

---

[2] Agent Buck testified that the sample provided pursuant to the medical blood draw did not have a sufficient quantity for testing for drug toxicology.

razor blades were used "to scrape and line up certain powders," and the small container had an object inside that was "likely to be used to crush another object like a pill," similar to a mortar and pestle. Trooper Alexander did not have the objects tested for residue.

Trooper Alexander also testified as an expert in crash reconstruction. Pursuant to his examination of the air bag control modules of both vehicles, he concluded that at the time of the collision, the defendant's vehicle had been traveling at approximately twice the legal speed limit, while Ms. Heines had been driving at a low speed.

Lastly, the State called Dr. Feng Li, Chief Medical Examiner for Metropolitan Nashville and Davidson County. Dr. Li performed an autopsy of Ms. Heines to determine the cause of death and concluded that she died as a result of multiple blunt force injuries. Even though Ms. Heines was not wearing her seatbelt at the time of the accident, Dr. Li stated that his experience is that "when people are involved in motor vehicle accidents, some people wear seatbelts and still die and some people don't wear seatbelts and they die."

The defendant chose not to offer proof at trial. After reviewing all the evidence, the jury found the defendant guilty of vehicular homicide by intoxication and possession of drug paraphernalia. After a sentencing hearing, the trial court imposed an effective ten-year sentence. The defendant filed a motion for a new trial which the trial court denied, and this timely appeal followed.

### *Analysis*

On appeal, the defendant contends the trial court erred in denying her motion to suppress the blood test results from the warrantless blood draw. Specifically, the defendant argues that because of her extensive injuries and mental impairment, her consent to the blood draw was invalid and that the resulting evidence should have been suppressed. The defendant also contends that the State failed to present sufficient evidence at trial that the items found in the defendant's vehicle were drug paraphernalia. The State submits that the trial court properly concluded that the State had carried its burden of establishing voluntary consent and that the evidence presented at trial was sufficient to sustain the defendant's conviction of possession of drug paraphernalia. We conclude that the trial court erred in denying the defendant's motion to suppress, but that the error was harmless. Additionally, we conclude the evidence was sufficient to establish a conviction of possession of drug paraphernalia. Therefore, we affirm the defendant's convictions.

### I.    Trial Court's Denial of the Motion to Suppress

A trial court's findings of fact at a suppression hearing are binding on an appellate court unless the evidence preponderates against them. *State v. Bell*, 429 S.W.3d 524, 528 (Tenn. 2014). "The credibility of the witnesses, the weight and value of the evidence, and the resolution of conflicts in the evidence are matters entrusted to the trial court as the trier of fact." *Id.* at 529 (citing *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012)). "The prevailing party in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). However, this court reviews the trial court's application of the law to the facts *de novo* with no presumption of correctness. *See State v. Montgomery*, 462 S.W.3d 482, 486 (Tenn. 2015) (citing *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)). "Further, appellate courts, when evaluating the correctness of the ruling by the trial court on a motion to suppress, may consider the entire record, including not only the proof offered at the hearing, but also the evidence adduced at trial." *State v. Williams*, 368 S.W.3d 468, 473 (Tenn. 2012).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution provide protections from unreasonable searches and seizures. U.S. const. amend. IV; Tenn. const. art. 1, § 7. It is well established that Article 1, section 7 is identical in intent and purpose to the Fourth Amendment. *State v. Reynolds*, 504 S.W.3d 283, 312-13 (Tenn. 2016); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). The collection of a blood sample is a search and seizure subject to constitutional limitations. *See Skinner v. R. Labor Executives' Assn.,* 489 U.S. 602, 616 (1989); *State v. Scarborough*, 201 S.W.3d 607, 616 (Tenn. 2006). "An accused's blood cannot be taken or analyzed unless the search is reasonable pursuant to the Fourth Amendment." *State v. Henry*, 539 S.W.3d 223, 234 (Tenn. Crim. App. 2017) (citing *Birchfield v. North Dakota*, 579 U.S. 438, 455 (2016)). "[T]he physical intrusion occasioned by a blood draw 'infringes an expectation of privacy' and "'[t]he ensuing chemical analysis of the sample . . . is a further invasion of the tested [individual's] privacy interests.'"" *Scarborough*, 201 S.W.3d at 616 (quoting *Skinner*, 489 U.S. at 616).

Generally, a warrantless search is considered presumptively unreasonable, and thus, violative of constitutional protections. *See State v. Walker*, 12 S.W.3d 460, 467 (Tenn. 2000). However, "one of the exceptions to the warrant requirement is a search conducted pursuant to consent." *State v. Bartram*, 925 S.W.2d 227, 230 (Tenn. 1996) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).

Actual consent to a warrantless search "must be 'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" *State v. Cox*, 171 S.W.3d 174, 184 (Tenn. 2005) (quoting *State v. Simpson*, 968 S.W.2d 776, 784 (Tenn. 1998)). "The pertinent question is this: whether the [individual's] act of consenting is the product of an essentially free and unconstrained choice. If the [individual's] will was overborne and his

or her capacity for self-determination critically impaired, due process is offended." *Cox*, 171 S.W.3d at 185. The determination of a defendant's capacity to consent is a question of fact to be determined from the totality of the circumstances. *See id.* at 184.

In *State v. Henry*, this Court explained,

Factors to consider in determining whether consent is voluntary include the time and place of the encounter, whether the encounter was in a public or secluded place, the number of officers involved, the degree of hostility during the incident, whether weapons were displayed, whether consent was requested, and whether the consenter initiated contact with the police." *Cox*, 171 S.W.3d at 185. In addition, an individual's "age, education, intelligence, knowledge, maturity, sophistication, experience, prior contact with law enforcement personnel, and prior cooperation or refusal to cooperate with law enforcement personnel" are relevant in determining whether consent in voluntary. *Id.* (internal quotations marks omitted). Also, proof including, but not limited to, evidence regarding the defendant's physical condition and the adverse effects of medications on a defendant's judgment and reasoning may establish that a defendant lacks the capacity to voluntarily consent. *Cf. Reynolds*, 504 S.W.3d at 309. Finally, … an individual's "'[k]nowledge of the right to refuse consent' "is also a factor in determining the voluntariness of consent." *Id.* at 307 (*quoting Schneckloth*, 412 U.S. at 235-47).

*Henry,* 539 S.W.3d 223, 241-42 (Tenn. Crim. App. 2017). "The burden is on the prosecution to prove that the consent was given freely and voluntarily." *State v. Blackwood,* 713 S.W.2d 677, 680 (Tenn. Crim. App. 1986) (citing *State v. McMahan*, 650 S.W.2d 383 (Tenn. Crim. App. 1983)).

The question before this Court is whether the evidence presented at the hearing and at trial preponderates against the trial court's determination that the defendant voluntarily consented to the warrantless blood draw. Reviewing the totality of the circumstances, we conclude that the evidence of the defendant's physical and mental condition preponderates against a finding that the defendant possessed the capacity to consent, and therefore, the State failed to meet its burden.

In its order denying the motion to suppress, the trial court determined that based upon the evidence presented at the hearing there was no evidence of any "coercive conduct on the part of law enforcement" to obtain the defendant's consent. The trial court found specifically that "the [D]efendant was not restrained, under arrest or in custody." Despite the defendant's immobilized state while being questioned, we do not find that a preponderance of the evidence weighs against this finding by the trial court. Therefore, we

defer to the trial court's determination that there was no explicit coercion on the part of law enforcement.

However, we cannot ignore evidence of the defendant's diminished mental and physical state. At the hearing and at trial, considerable evidence was presented regarding the defendant's inability to communicate with law enforcement. Trooper Barber testified that communication with the defendant at the scene of the collision was "unsuccessful," describing the defendant as "incoherent, babbling, muttering." Upon Lt. Smith's first encountering the defendant, he noted that her speech was "indiscernible." Minutes later, during the second attempted interview, Lt. Smith stated that he could not communicate with the defendant. Lastly, 15 minutes after the second attempt, the defendant still did not answer Lt. Smith's questions concerning the crash. However, Lt. Smith testified "she was coherent" because she responded to his request for consent. If the defendant was incoherent at the time of the accident, and still not sufficiently coherent during the first and second interviews with Lt. Smith, it is highly improbable that 15 minutes later, the defendant had the mental capacity to consent.

Recognizing that Lt. Smith testified that the defendant thrice answered 'yes' to the request for consent to the blood draw, the trial court's determination that this evidence alone was indicative that the defendant was "essentially coherent" discounts the three previous interactions between the defendant and law enforcement. Beyond this affirmative answer and identifying herself to a nurse, no other evidence was presented by the State that the defendant was able to communicate or converse with law enforcement. Therefore, finding the defendant "essentially coherent" at the time of consent contradicts the facts of the case and misapplies the 'totality of the circumstances' standard. We also note that the trial court's conclusion that the defendant was "essentially coherent" does not meet the legal requirement that "[t]o be valid, consent must be "'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" *State v. Ingram*, 331 S.W.3d 746, 760 (Tenn. 2011) (quoting *State v. Berrios*, 235 S.W.3d 99, 109 (Tenn. 2007)).

We cannot overlook the defendant's injuries and the medication she was given and how that might have impacted her ability to consent. The United States Court of Appeals for the Sixth Circuit has recognized, "[i]t is no doubt the case that medication or intoxication may diminish the capacity to consent to the extent it undermines an individual's grasp on the reality of what he is doing" and that "in some settings, the influence of drugs, prescribed or otherwise, or the influence of alcohol may tip the balance in favor of finding a lack of capacity to consent to the search." *United States v. Montgomery*, 621 F.3d 568, 572 (6th Cir. 2010).

Here, Lt. Smith testified at the suppression hearing and at trial that he was aware the hospital had administered fentanyl to the defendant. Lt. Smith also testified that fentanyl

is a "powerful" drug. The evidence also established that due to the brutal nature of the head-on collision involved in this case, the defendant suffered multiple injuries, most significantly a frontal lobe head injury, and the defendant was required to be immobilized in a brace. The trial court did not consider any of this evidence in its order denying the motion to suppress and, therefore, did not properly derive its decision from the totality of the circumstances.

Additionally, though not raised by either party, the statute in effect at the time of the offense provided:

(e) Upon a finding of probable cause for [DUI, vehicular assault, aggravated vehicular assault, vehicular homicide, or aggravated vehicular homicide], a law enforcement officer may administer a blood test for the purpose of determining the alcohol or drug content, or both, of that operator's blood only:

(1) With the consent of the operator of the vehicle and after executing the waiver set out in subsection (g);

(2) With a search warrant issued in accordance with title 40, chapter 6, part 1, and Rule 41 of the Tennessee Rules of Criminal Procedure; or

(3) Without the consent of the operator of the vehicle if, on a case by case basis, one (1) or more of the recognized exigent circumstances to the search warrant requirements exist.

(f) The implied consent given by the operator of a motor vehicle pursuant to subdivision (d)(1), is not sufficient to comply with the consent required to administer a blood test pursuant to this section. Unless the *operator voluntarily signs the waiver form*, a properly executed search warrant or a recognized exigent circumstance is required to obtain blood from the operator.

(g) If the operator of a motor vehicle consents to the administration of a blood test to determine the alcohol or drug content of the operator's blood in the absence of a search warrant authorizing a blood test or a recognized exigent circumstance, *the operator shall sign a standardized waiver* developed by the department of safety and made available to law enforcement agencies that have the authority to make arrests for [DUI, vehicular assault, aggravated vehicular assault, vehicular homicide, or aggravated vehicular homicide]. If the operator cannot read the waiver for any reason, the officer shall read the

- 10 -

waiver to the operator.  If the waiver is read to the operator, no presumption of the operator's impairment or intoxication is created and no presumption is created that the operator understood the meaning or consequences of the form the operator signed.  It is not admissible in court against the operator that the waiver was read to the operator and the operator shall have the opportunity in court to present evidence that the operator did not understand the meaning or consequences of signing the form.  *The operator shall sign and date the waiver and the law enforcement officer shall initial the waiver*.

Tenn. Code Ann. § 55-10-406(e)-(g) (2017) (amended 2019) (emphasis added).  The statute, however, does not affect the admissibility of "any chemical analysis of the alcohol or drug content of the defendant's blood that was not compelled by law enforcement but was obtained while the defendant was hospitalized or otherwise receiving medical care in the ordinary course of medical treatment."  *Id*. § 55-10-406(j).  Here, the defendant was not offered and did not execute a written waiver.  Accordingly, despite the trial court's finding that the defendant's waiver was voluntary, the waiver did not meet the requirements of the statute, and the results of the warrantless blood draw were not admissible.

We must now evaluate the effect of this error on the defendant's conviction. The question is "'whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'"  *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008).  The State carries the burden of demonstrating the error was harmless."  *Id*. at 371 (quoting *State v. Allen*, 69 S.W.3d 181, 190 (Tenn. 2002)).

At trial, the State introduced evidence of the defendant's guilt.  Lt. Smith testified that immediately after the warrantless blood draw, he obtained a search warrant for the medical blood draw that had previously occurred.  Agent Douglass analyzed the evidence collected from the medical blood draw and testified that the defendant's blood alcohol content was 0.156 gram percent, almost double the legal limit.  Because this evidence was sufficient to establish guilt beyond a reasonable doubt on its own, the trial court's error did not contribute to the verdict.  The defendant is not entitled to relief on this issue.

## II.    Sufficiency of the Evidence

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ( "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190–92 (Tenn.

1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *See id.* at 379. Circumstantial evidence alone may be sufficient to support a conviction. *State v. Richmond*, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.* This Court will not exchange its' "inferences for those drawn by the trier of fact from circumstantial evidence." *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

The defendant argues that the evidence at trial was insufficient because the State failed to establish the items found in the defendant's vehicle were "drug paraphernalia" or

that the defendant intended to use the objects as such. The State submits that the jury could have reasonably concluded from several points of evidence that the objects found in the defendant's car were drug paraphernalia. We agree with the State.

Generally, it is unlawful for a person to possess, with the intent to use, drug paraphernalia. Tenn. Code Ann. § 39-17-425(a)(1). Possession of drug paraphernalia is a Class A misdemeanor. Tenn. Code Ann. § 39-17-425(a)(2). At trial, the State has the burden to prove beyond a reasonable doubt: (1) that the defendant possessed the object; (2) that the object possessed was classifiable as drug paraphernalia; and (3) that the defendant intended to use the object for an illicit purpose. *State v. Mallard*, 40 S.W.3d 473, 476 (Tenn. 2001). Drug paraphernalia is defined by statute as "all equipment products and materials of any kind which are used, intended for use, or designed for use in . . . ingesting, inhaling or otherwise introducing into the human body, a controlled substance." Tenn. Code Ann. § 39-17-402(12).

Here, the objects at issue were a segmented straw, a razor blade, and a container resembling a mortar and pestle. The defendant concedes the first element of the offense, possession of the items. However, she argues there was not sufficient evidence of the second element, classification of the items as drug paraphernalia, or the third element, that she intended to use the items for an illicit purpose.

At trial, Troopers Brock and Alexander testified that the items found were commonly used to crush pills into powder, scrape and line up powder, and ingest powder into the body nasally. The evidence established that the defendant possessed a bottle of opiate pills prescribed to another person. In addition, the defendant presented no contrary evidence to establish a legitimate use or explanation for the items. *See State v. Foster*, 2021 WL 1158156, *9 (Tenn. Crim. App. 2021) ("A jury is free to consider that the defendant never provided any proof of an innocent explanation for the presence of the items".)

Considering this evidence in the light most favorable to the State, a rational trier of fact could have determined that the items found in the defendant's car were objects used for the ingestion of a controlled substance and that the defendant had the intent to use them as such. Therefore, we conclude the evidence adduced at trial was sufficient to sustain the defendant's conviction. The defendant's challenge to the sufficiency of the evidence is without merit.

### *Conclusion*

Based on the foregoing reasoning and authority, we conclude the trial court's denial of the defendant's motion to suppress was an error. However, the error was harmless and,

thus, we affirm the defendant's conviction for vehicular homicide by intoxication.  We also affirm the defendant's conviction for possession of drug paraphernalia.

_____
J. ROSS DYER, JUDGE