# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### May 13, 2014 Session

## STATE OF TENNESSEE v. CURTIS W. HAMMOCK

**Appeal from the Circuit Court for Dickson County**
**No. 22CC-2012-CR-501     Robert Burch, Judge**

---

**No. M2013-01382-CCA-R3-CD - Filed July 15, 2014**

---

Appellant, Curtis W. Hammock was indicted for initiating a process intended to result in the manufacture of methamphetamine, being a felon in possession of a handgun, and child neglect. He pleaded guilty to the first two counts and received a sentence of ten years on the drug charge to be served in community corrections and a concurrent sentence of two years in community corrections for the handgun charge. The State dismissed the child neglect charge. As a condition of his guilty plea, appellant, with agreement from the State and the trial court, reserved a certified question of law for our consideration: "Whether the trial court correctly ruled[,] following a suppression hearing[,] that the Defendant did voluntarily consent to a search of his residence subsequent to the unlawful entry of law enforcement on June 12, 2012?" Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

Timothy V. Potter (at plea acceptance hearing and on appeal); and Andrew E. Mills (on appeal), Dickson, Tennessee, for the appellant, Curtis W. Hammock.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Dan Mitchum Alsobrooks, District Attorney General; and Margaret F. Sagi and Carey J. Thompson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case arises from a warrantless search of appellant's residence that revealed the presence of a methamphetamine laboratory ("meth lab") and appellant's possession of a handgun after previously being convicted of a felony. The child neglect charge arose

because appellant's minor son was present in the residence at the time the meth lab was functional.

## I. Facts

The trial court held a hearing on appellant's motion to suppress the evidence seized as a result of law enforcement's warrantless, although consensual, search of his residence. Agent Chris Freeze with the Twenty-Third Judicial District Drug Task Force testified that during the course of interviewing another subject, Brunette Gray, appellant's name was mentioned. Agent Freeze was, at that time, unfamiliar with appellant. Ms. Gray informed Agent Freeze that appellant had purchased copious amounts of Sudafed from various locations. Agent Freeze informed his partner, Agent Chris Pate, about this information, and Agent Pate then searched the IMPLEX record, which is a registry of Sudafed purchases. Agent Pate learned that appellant had purchased Sudafed that day, June 12, 2012, and that he had previously made "multiple, multiple purchases from multiple stores in multiple counties, in multiple areas." Agent Freeze confirmed that the amount of Sudafed purchased by appellant would have constituted a criminal offense if purchased for the purpose of manufacturing methamphetamine. Based on this information, the agents decided to conduct "a meth interview/investigation" at appellant's residence.

Agent Freeze testified that appellant's residence was located at the top of an "extremely rutted and pitted" driveway that required them to take a "running start" in the vehicle to ascend. As they reached the crest of the driveway, Agent Freeze observed a male, who he later learned was Jerry Shane Webster, standing in front of an open garage door and a female, who he later learned was Tara Rose, standing on the bumper of a truck reaching into the bed of it. The female saw the officers and "jumped, took off, come [sic] down the hill running, hollering that - and dropped something as she took off running." He stated that she yelled, "[I]t was the effing police or the effing Task Force." Agent Freeze was unaware of what the female dropped on the ground, but he followed her through the garage, through a door, up some steps, and into the house. As he was doing so, he unholstered his weapon. He stated that he did not know what her intent was or whether she intended to arm herself.

Agent Freeze explained that as he pursued the female up the steps, he announced that he was with the Drug Task Force and that he was entering the residence. At the top of the steps, he encountered appellant's son, J.H.,[1] who advised him that the female had thrown something into the trash can and had run through the back door. Appellant walked up behind his son. Agent Freeze looked around the kitchen and could see that the back door was open. He went outside to be sure that the female was not in sight. Once outside, he told appellant

---

[1] It is the policy of this court to refer to minor children by their initials.

why he was there and asked appellant and J.H. to join him outside and speak with him. He then asked appellant for consent to "clear the house to make sure that the female" was no longer there because he did not personally observe her leave the residence. Appellant advised that agents "could absolutely search the residence." Agent Freeze relayed appellant's consent to Agent Pate, who had the other male, Mr. Webster, detained.

Agent Freeze stated that he asked appellant and J.H. to exit the residence to talk with him before asking for consent because he did not "want them to feel intruded upon." He reiterated, "[O]nce I followed her in there[,] I wanted them to know that I was willing to talk to them and explain to them what was going on and not for them to feel intimidated . . . so that's why I called them out[] and asked for permission to go back into the house and search after that." He further clarified that although he had "drawn out" his weapon, he never had his "gun up" and that he "had it down to [his] side as [he] was going up the steps." He described the stairs as a "fatal funnel," an area where he did not know "how the room plays out," so he felt he needed to have his gun out. However, he did not point the weapon at anyone. When he talked with appellant and J.H., he "holstered up immediately."

Agent Freeze said that he later learned that Ms. Rose had dropped a blue funnel as she fled the area, which would have been instrumental in the process of manufacturing methamphetamine. He stated that during his initial pursuit of Ms. Rose through the garage, he did not notice anything amiss because he was "focused on her and what she was doing." However, after he obtained consent to search the residence, he observed a revolver and a plate covered with white residue and some straws in appellant's bedroom. He also found "multiple pills" inside "little containers" throughout the residence. Agent Freeze testified that he observed an active meth lab in the garage/basement area through which he had initially passed.

On cross-examination, Agent Freeze explained that they decided to conduct the initial investigation that night rather than wait until the following day because appellant had made a Sudafed purchase that day. If appellant could not produce the Sudafed he had purchased earlier in the day, that would have provided additional cause for suspicion. He stated that he did not believe that he needed a search warrant to conduct an interview but that it was "possible" that he already had enough information to obtain one. Had events not transpired as they did, Agent Freeze would not have asked to search the residence. Agent Freeze confirmed that they arrived at the residence around 10:00 p.m. and that they were driving an unmarked vehicle and wearing "plain clothes."

Agent Freeze denied ordering appellant and J.H. to get down on the floor or that he pointed his weapon at them. He gave no "instructive command" to them at that time. He clarified that he *asked*, rather than *instructed*, them to join him on the back porch to talk with

him.  Agent Freeze confirmed that he ascertained that appellant was a legal resident of the home, which was owned by appellant's mother.

On redirect examination, Agent Freeze agreed that based on appellant's history of Sudafed purchases, he believed he had probable cause to arrest appellant for promotion of methamphetamine prior to interviewing him.  However, Agent Freeze wanted to obtain additional evidence for trial purposes.

Task Force Agent Michael Pate testified next and stated that he worked primarily on cases involving methamphetamine.  He was not working on June 12, 2012, but Agent Freeze telephoned him and informed him that Ms. Gray stated she had been purchasing Sudafed on behalf of appellant.  Agent Pate referred to the IMPLEX database and learned that appellant had purchased a box of Sudafed just a few minutes prior.  That fact, coupled with Agent Freeze's telephone call and the "consistent pattern . . . [and] frequency of purchases," raised Agent Pate's suspicion that appellant had been purchasing Sudafed for the purpose of manufacturing methamphetamine.  Thus, the agents made the decision to go to appellant's home that night.

Agent Pate stated that as they ascended appellant's driveway, his tires began spinning in the gravel.  Through his open window, he observed a white female who looked at him and said, "'Oh, f**k, Drug Force,'" and "took off running to the house."  As she was running, she dropped something on the ground.  Agent Pate saw the woman run through a basement or garage; he explained that "[i]t was a basement house[,] but it had a garage door and then it had a regular open walk-through door."  The doors were on the side of the house, and the driveway led to them.  Agent Freeze chased after the female, and Agent Pate "went for the fellow" who was standing there.  At some point Agent Freeze looked in the garage and observed an active "one-pot meth lab sitting on a table."

Agent Pate testified that several minutes later, Agent Freeze returned with appellant and his son, and the agents received consent to search the residence and vehicles.  They recovered drug paraphernalia that Ms. Rose had deposited into the trash can; an "old meth lab" concealed inside a cooler; and some "old meth trash" in Mr. Webster's truck.  They also recovered two weapons from appellant's bedroom and a shotgun from J.H.'s bedroom.  Agent Pate opined that what they observed was, indeed, a meth lab because of the presence of drain cleaner, Sudafed, and lithium batteries.  He commented that the item Ms. Rose dropped, a funnel, was used in the manufacture of methamphetamine.  Agent Pate stated that Mr. Webster was fully cooperative and that they located Ms. Rose the following day at a nearby gas station.  He never unholstered his weapon and never observed Agent Freeze with his weapon unholstered.  Agent Pate remained outside with appellant while Agent Freeze searched the residence.

Appellant's son, J.H., testified that he was sixteen years old at the time of the hearing and that he recalled the night in question. On June 12, he was sitting on the sofa watching television, and appellant was on the telephone with his wife, J.H.'s stepmother. He recalled that Agent Freeze ascended the stairs from the basement and entered the area shouting, "'Task Force,'" with his weapon drawn. J.H. said that Agent Freeze pointed the weapon at him and then appellant and that he ordered appellant to the ground. Agent Freeze then asked appellant to stand up and told them to go into the kitchen, where they talked. J.H. recalled that Agent Pate entered through the back door and asked him to walk outside while Agent Freeze continued talking with appellant in the kitchen. J.H. did not hear anyone ask for permission or consent to search the residence. He stated that the search lasted for "over an hour or two."

After hearing arguments of counsel, the trial court concluded that appellant gave officers consent to search his residence and that the consent was not contaminated by the initial warrantless entry into the residence. The court held:

> There's two issues here. The first issue is the initial entry into the house in pursuit of the female subject. As the officers approached the residence they had some suspicion of some drug activities. What that was[,] they were not sure. A female makes a statement that this is the Drug Task Force along with an [expletive] and runs into the house.
>
> Officer Freeze could only pursue that female into the house if he had enough for a *Terry* stop[,] and in a *Terry* stop[,] you have to have reasonable suspicion that illegal activity is going on. Now you've got – obviously suspect some kind of drug activity, she calls out the Task Force and she runs into the house. She may or may not have been involved with it.
>
> The pursuit of the female into the house was an illegal entry into the house. All it was[,] was suspicion. At this time, it didn't rise to the area of reasonable suspicion. And apparently it was pretty much, from what I could tell from and some of the proof is diametrically opposed, you know, I can't accept all of it; but apparently from the evidence that I perceive occurred pretty much the female [suspect] and Officer Freeze were in the front door and out the back door. That jives with Officer Pate's testimony, who was not in the house at the time; and the timing of it – there's just too – the young [J.H.]'s testimony here, too much hadn't happened. There wasn't enough time for that to happen. So apparently they were just in the front door and pretty much out the back and then at that time Officer Freeze asked the defendant and his son

-5-

to step out on to the back porch and requested consent. And again to quote, "Clear the house."

The court finds that consent was given and consent was not contaminated by the entrance into the house. It was just in the front door, which way did she go, out the back in pursuit.

Once consent was given[,] the objects were found . . . in a manner [commensurate] with searching for an individual. You walk into a bedroom looking for an individual, you don't see an individual, but you see [a] pistol lying on a table[,] that kind of thing; so the scope of the search was not exceeded.

Appellant subsequently entered guilty pleas to initiating a process intended to result in the manufacture of methamphetamine and being a felon in possession of a handgun. He received a sentence of ten years on the drug charge and two years on the gun charge, suspended after serving six months. As part of the plea agreement, he also reserved the following certified question of law: "Whether the trial court correctly ruled[,] following a suppression hearing[,] that the Defendant did voluntarily consent to a search of his residence subsequent to the unlawful entry of law enforcement on June 12, 2012?"

## II. Analysis

### A. Certified Questions

Rule 3(b)(2) of the Tennessee Rules of Appellate Procedure permits a defendant to plead guilty while reserving the right to appeal a certified question of law that is dispositive of the case. In doing so, a defendant must also comply with the requirements of Rule 37(b)(2)(A) of the Tennessee Rules of Criminal Procedure. Rule 37 outlines the following requirements:

(i)     the judgment of conviction or order reserving the certified question that is filed before the notice of appeal is filed contains a statement of the certified question of law that the defendant reserved for appellate review;

(ii)    the question of law as stated in the judgment or order reserving the certified question identifies clearly the scope and limits of the legal issue reserved;

(iii)    the judgment or order reserving the certified question reflects that the certified question was expressly reserved with the consent of the state and the trial court; and

(iv)    the judgment or order reserving the certified question reflects that the defendant, the state, and the trial court are of the opinion that the certified question is dispositive of the case.

Tenn. R. Crim. App. 37(b)(2)(A)(i)-(iv).

Our courts have explicitly defined the prerequisites to an appellate court's consideration of the merits of a question of law certified pursuant to Rule 37(b)(2):

Regardless of what has appeared in prior petitions, orders, colloquy in open court or otherwise, the final order or judgment from which the time begins to run to pursue a [Tennessee Rule of Appellate Procedure] 3 appeal must contain a statement of the dispositive certified question of law reserved by defendant for appellate review and the question of law must be stated so as to clearly identify the scope and the limits of the legal issue reserved. For example, where questions of law involve the validity of searches and the admissibility of statements and confessions, etc., the reasons relied upon by defendant in the trial court at the suppression hearing must be identified in the statement of the certified question of law and review by the appellate courts will be limited to those passed upon by the trial judge and stated in the certified question, absent a constitutional requirement otherwise. Without an explicit statement of the certified question, neither the defendant, the State nor the trial judge can make a meaningful determination of whether the issue sought to be reviewed is dispositive of the case. Most of the reported and unreported cases seeking the limited appellate review pursuant to [Tennessee Rule of Criminal Procedure] 37 have been dismissed because the certified question was not dispositive. Also, the order must state that the certified question was expressly reserved as part of a plea agreement, that the State and the trial judge consented to the reservation and that the State and the trial judge are of the opinion that the question is dispositive of the case. Of course, the burden is on defendant to see that these prerequisites are in the final order and that the record brought to the appellate courts contains all of the proceedings below that bear upon whether the certified question of law is dispositive and the merits of the question certified. No issue beyond the scope of the certified question will be considered.

*State v. Bowery*, 189 S.W.3d 240, 245 (Tenn. Crim. App. 2004) (quoting *State v. Preston*, 759 S.W.2d 647, 650 (Tenn. 1988)). The *Preston* requirements are mandatory. *Bowery*, 189 S.W.3d at 245-46 (citing *State v. Pendergrass*, 937 S.W.2d 834, 837 (Tenn. 1996)). Failure to comply with the requirements results in dismissal of the appeal. *Id.* (citing *Pendergrass*, 937 S.W.2d at 837).

Having concluded that the certified question in this matter meets the stringent standards of *Preston*, we address the question of whether law enforcement officers obtained appellant's voluntary consent to search his residence.

### B.  Motion to Suppress — Standard of Review

The facts underlying appellant's certified questions were developed during a hearing on the motion to suppress the evidence against him. The trial court issued verbal and written findings. A trial court's findings of fact at a hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001). As the trier of fact, the trial court is in a better position to assess the witnesses' credibility, determine the weight of the evidence and the value to be afforded it, and resolve any conflicts in the evidence. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). However, the trial court's conclusions of law are not binding on this court. *State v. Randolph*, 74 S.W.3d 330, 333 (Tenn. 2002). Further, the trial court's applications of law to the facts are questions of law that we review de novo. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000).

At a hearing on a motion to suppress evidence recovered as a result of a warrantless search, the State must prove that the search was reasonable. *State v. Coulter*, 67 S.W.3d 3, 41 (Tenn. Crim. App. 2001). To carry its burden, the State must prove that law enforcement conducted the warrantless search or seizure pursuant to one of the narrowly-defined exceptions to the warrant requirement. *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). On appeal, the prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn therefrom. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The defendant bears the burden of establishing that the evidence contained in the record preponderates against the trial court's findings of fact. *Braziel v. State*, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975).

### C.  Consent to Search

It is undisputed that the police officers did not have a warrant to search appellant's residence. Our supreme court has held that consent to search is a valid exception to the warrant requirement:

[U]nder both the federal constitution and our state constitution, a search without a warrant is presumptively unreasonable, and any evidence obtained pursuant to such a search is subject to suppression unless the state demonstrates that the search was conducted under one of the narrowly defined exceptions to the warrant requirement. Moreover, Tennessee has approved of and adopted exceptions to the requirement of obtaining a valid search warrant, including search incident to arrest, plain view, stop and frisk, hot pursuit, search under exigent circumstances, and others. Well settled among the exceptions to the warrant requirement, and the one with which we are engaged here, is consent to search.

*State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005) (internal citations omitted).

Furthermore, to justify a search, the consent given must be "unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *State v. Simpson*, 968 S.W.2d 776, 784 (Tenn. 1998) (quoting *State v. Brown*, 836 S.W.2d 530, 547 (Tenn. 1992)). The question of whether consent was voluntary is determined from the totality of the circumstances. *Cox*, 171 S.W.3d at 183-84 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 243 (1973)). "The pertinent question is this: whether the defendant's act of consenting is the product of an essentially free and unconstrained choice. If the defendant's will was overborne and his or her capacity for self-determination critically impaired, due process is offended." *Id.* at 185 (citing *Schneckloth*, 412 U.S. at 225-26). In assessing the totality of the circumstances, relevant factors to consider are: "(1) [t]ime and place of the encounter; (2) [w]hether the encounter was in a public or secluded place; (3) [t]he number of officers present; (4) [t]he degree of hostility; (5) [w]hether weapons were displayed; (6) [w]hether consent was requested; and (7) [w]hether the consenter initiated contact with the police." *Id.* (citation omitted).

In its findings regarding the motion to suppress, the trial court clearly credited the testimony of the law enforcement officers over that of appellant's son, and we defer to its factual findings and resolution of conflicts in the evidence. *See Odom*, 928 S.W.2d at 23. Thus, the testimony presented, as accredited by the trial court, showed that although the encounter took place at night, appellant and his son were awake, and his co-defendants were outside. Only two officers were present, and the encounter was not hostile. Officer Freeze briefly unholstered his weapon as he proceeded through what he described as a "fatal funnel," or an area of which he had no visibility, but he immediately reholstered it when speaking with appellant and J.H. Officer Freeze removed himself from the home and requested that appellant and his son speak with him on the back porch, at which time appellant gave his consent to "clear the house." During the "clearing" process, officers found the handgun and the meth lab. As the trial court noted, those objects were in plain

view, and officers did not exceed the scope of the consent to clear the residence in finding them. The only factor in appellant's favor is that the encounter was in a secluded location, appellant's home. Viewing the totality of the circumstances, we cannot say that the evidence preponderates against the trial court's findings.

However, the pivotal question in this case is whether appellant's consent to search was contaminated by the officer's illegal entry into his home. "A consent to search that is preceded by an illegal seizure is not 'fruit of the poisonous tree' if the consent is both: 1) voluntary, and 2) not an exploitation of the prior illegality." *State v. Garcia*, 123 S.W.3d 335, 346 (Tenn. 2003) (citations omitted). Having determined that the consent was, in fact, voluntary, we next consider whether it was "an exploitation of the prior" illegal entry. *Id.*

Although this case involves an unlawful entry rather than an unlawful seizure, we find instructive the principle that "[w]hen determining whether a voluntary consent is sufficiently attenuated from an unlawful seizure, we are guided by the following factors: "1) the temporal proximity of the illegal seizure and consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the official misconduct." *Id.* at 346. As the trial court noted, the events occurred very rapidly, and as such, the entry and consent were close in time. However, we find it significant that after Ms. Rose exited the residence through the back door, Officer Freeze immediately reholstered his weapon, removed himself from the residence, and walked to the back porch. There, he asked appellant and J.H. to talk with him, and he requested consent to clear the house. He testified that he did so because he did not "want them to feel intruded upon." At the hearing, he reiterated, "[O]nce I followed her in there[,] I wanted them to know that I was willing to talk to them and explain to them what was going on and not for them to feel intimidated . . . so that's why I called them out[] and asked for permission to go back into the house and search after that." That "intervening circumstance" removed any intimidation or contamination. Furthermore, we conclude that the purpose of Officer Freeze's initial entry weighs against the "flagrancy of the misconduct," in that he entered the residence only because he was uncertain of whether Ms. Rose might arm herself and return. His brief time in the residence before exiting also weighs against "flagrancy." The trial court did not err in denying appellant's motion to suppress.

## CONCLUSION

Based on our review of the record, the parties' briefs, applicable legal authorities, and the arguments of counsel, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE

-10-