IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 28, 2015, at Knoxville

## STATE OF TENNESSEE v. MICHAEL G. KOHLMEYER

**Appeal from the Circuit Court for Humphreys County**
**No. 12235    George C. Sexton, Judge**

_____

**No. M2014-01359-CCA-R3-CD - Filed July 7, 2015**

_____

A Humphreys County jury convicted the Defendant, Michael G. Kohlmeyer, of two counts of sexual exploitation of a minor, a Class D felony, and the trial court sentenced him to an effective sentence of two years. On appeal, the Defendant contends that the trial court erred when it denied his motion to suppress photographs and videos police officers found on his cellular telephone because the police officers did not have consent to search the phone or probable cause to view photographs and videos on the phone. After review, we affirm the convictions and sentences. We remand the case to the trial court for the entry of corrected judgments reflecting that the convictions and sentences are for sexual exploitation of a minor rather than attempted sexual exploitation of a minor.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which D. KELLY THOMAS JR., and TIMOTHY L. EASTER, JJ., joined.

William B. Lockert, III, Public Defender; and Dawn Kavanaugh, Assistant Public Defender, Ashland City, Tennessee, for the appellant, Michael G. Kohlmeyer.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Wendall Ray Crouch, Jr., District Attorney General; and Craig S. Monsue, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**

This case arises from sexually explicit photographs and videos found on the Defendant's cellular telephone. In April 2011, the Humphreys County grand jury indicted the Defendant for two counts of sexual exploitation of a minor based upon two separate videos found on his cellular telephone in January 2011. On August 25, 2011, the Defendant pleaded guilty to two counts of attempted sexual exploitation of a minor. On September 8, 2011, the trial court entered an agreed order allowing the Defendant to withdraw his guilty plea and ordering that the case be set for trial.

## A. Motion to Suppress

On September 20, 2011, the Defendant filed a motion to suppress the videos that law enforcement officers found on his cellular telephone. He contended in the motion that his phone was seized without a search warrant and without his consent. He argued that the officers' search of his phone exceeded his consent and that the images they found were fruit of the poisonous tree. The trial court held a hearing on the motion to suppress, wherein the following evidence was presented: Deputy Scott Daniel, a deputy with the Humphreys County Sheriff's Department, testified that he spoke with the Defendant on January 5, 2011. He testified that his department had received a call during which the caller stated that the Defendant intended to kill himself. Deputy Daniel and another officer were dispatched to the Defendant's residence to check on the Defendant's welfare. When the officers arrived, they asked the Defendant about the message he had made via the social media website "Facebook" about attempting suicide, and the Defendant said that he was "messing around" and had "no intention[] of actually doing it." The Defendant told the officers that he had sent the message about suicide over the internet using his phone. Deputy Daniel testified that another deputy, Detective Brian Baker, asked the Defendant if he could "look through [the Defendant's] phone, and [the Defendant] advised h[im that] he could and handed him the phone." Deputy Daniel testified that he was standing next to Detective Baker, who checked the Defendant's text messages, but found that all messages had been erased.

Deputy Daniel said that, at this point, Detective Baker asked Deputy Daniel to look though the Defendant's phone in an attempt to find the "internet part of it." Deputy Daniel did not ask the Defendant if he could look through his phone, but the Defendant was standing there when Detective Baker asked Deputy Daniel to examine the phone. The Defendant said nothing at the time of Detective Baker's request. Deputy Daniel said that, while he was reviewing the "internet part" of the phone, he saw pictures of possibly underage girls that appeared to have been sent from the Defendant's phone. Deputy Daniel said that he told Detective Baker about the pictures, and then he returned the phone to Detective Baker.

Deputy Daniel testified that the Defendant never asked that his phone be returned or expressed any desire for the search to be discontinued. After the pictures were found,

-2-

Detective Baker drafted a property receipt so that officers could keep the phone, and the Defendant signed the receipt. The deputy said that, before their arrival at the Defendant's house, the officers had no suspicion that the Defendant may have committed a crime. Deputy Daniel testified that he never advised the Defendant of his rights.

During cross-examination, Deputy Daniel testified that the officers decided that the Defendant did not need any medical intervention after the Defendant stated that he had no intention of hurting himself and they could not find evidence of a statement on the Defendant's phone that he intended to hurt himself. Deputy Daniel said he checked the "media file" on the Defendant's phone, which contained videos, pictures, and other items sent over the internet. He was looking for anything regarding the internet, such as "Facebook." It was in this file that the deputy found the pictures that roused his suspicion.

Detective Dewayne Jackson, a detective with the Humphreys County Sheriff's Department, testified that he interviewed the Defendant at the Defendant's house on January 7, 2011. He stated that he questioned the Defendant, who was not under arrest at the time, about the potential for suicide and also about the questionable material found on the Defendant's cell phone. Detective Jackson said that only he and the Defendant were present during the interview and that the Defendant never asked him to leave. The detective described the Defendant as "very cooperative."

Detective Jackson identified a "permission to search" form that the Defendant signed during a second visit to the Defendant's house on January 14, 2011. The form authorized police to search the Defendant's cell phone for any images, pictures, or memory contained in the cell phone. The detective said that he went over the form with the Defendant, who seemed to understand its contents, before the Defendant signed the form. The Defendant was, again, "very cooperative."

During cross-examination, the detective said that at the time of the January 7 interview he was in possession of the Defendant's cell phone. He said that he did not offer to give the phone back to the Defendant but that the Defendant never asked for the phone to be returned. Detective Jackson said that his return visit to the Defendant's house on January 14 was to have the Defendant sign the waiver so that the phone could properly be sent to the cyber crime unit. The detective told the Defendant that he was going to have the phone forensically analyzed and that there were two ways in which that could be done: he could obtain a search warrant or the Defendant could provide him permission to search. He said that the Defendant was "very very cooperative," reviewed the form, and then signed it.

Based upon this evidence, the trial court denied the Defendant's motion to suppress finding:

Well, the proof's been obviously that the officers had information that [the Defendant] had threatened suicide, that the message that he was going to commit suicide was sent over the internet. [The Defendant] apparently had sent it over his phone, although he denied sending such a message, denied that he was in any distress, but there's no way somebody in Pennsylvania could have known that he was threatening suicide without either a phone call or a message. The officers had a duty to make sure [the Defendant] was okay. It makes sense to the court.

He voluntarily turned his phone over to Officer Baker. It makes sense for the officers to check to see if there was some message on there threatening suicide where they could ask [the Defendant] about it to further ensure that he was in fact all right and in the course of doing so stumbled across – I'm assuming this message that was sent over the internet could be stored in practically any folder. It makes sense for the officers to check for the message. They did so, they did so with consent. Once the pictures were found, then they were justified in keeping the phone. There was never apparently any objection by [the Defendant] who later consented to the search of the phone.

The court finds that he consensually turned over the phone, never canceled or revoked his consent, so they were authorized in keeping the phone, and then later obtaining the permission to search and did in fact search the phone.

## B. Trial

The case proceeded to trial, during which the parties presented the following evidence: Deputy Daniel testified consistently with his testimony at the motion to suppress hearing, adding that when he and Detective Baker approached the Defendant they initially spoke with him about any type of suicidal thoughts or tendencies he was having. Deputy Daniel testified that the information given to the police during the call was that the Defendant was talking to a fifteen-year-old female from another state and that, when she asked him to stop texting her, he made comments that he was going to kill himself. The Defendant told officers that those comments were in jest and that he had no intention of hurting himself. The caller and the Defendant both made reference to the fact that these messages were sent via the Defendant's cell phone.

Deputy Daniel testified that Detective Baker asked the Defendant if he could see the

-4-

Defendant's cell phone. The Defendant gave his phone to Detective Baker, who tried to find the text messages but was unable to do so because they had been deleted. The Defendant indicated that he had been talking to the girl on Facebook using his phone. Detective Baker gave the phone to Deputy Daniel and asked if Deputy Daniel could find the phone messages that the two had exchanged via the internet on Facebook. Deputy Daniel looked at the media files on the phone. When he did so, he found pictures of what appeared to be underage, nude females. At this point, he showed the pictures to Detective Baker and then returned the phone to him. Deputy Daniel said he asked the Defendant about the pictures, and the Defendant started crying and told him that he had a "problem" and "needed help" because he could not stop looking at "porn."

During cross-examination, Deputy Daniel testified that he did not log on to the Defendant's Facebook account but, instead, looked at the folders on the Defendant's phone. He explained that he could not access the Defendant's Facebook account without the Defendant's username and password, and the Defendant had told him that he had already deleted the Facebook messages. The deputy said that he was looking for any saved messages in the media folders. The deputy testified that he was looking for messages that the Defendant may have saved wherein he threatened suicide.

At this point, the Defendant's attorney renewed his motion to suppress the evidence found on the Defendant's phone by Deputy Daniel. The trial court stated:

> Well, we've already had a hearing on it and I've overruled the motion to suppress. The officer testified [the Defendant] told him the messages had been deleted. He looked in the media files thinking that he might have saved them. I think that was within the scope of the consent that was given, so overruled.

Detective Brian Baker testified that he was working as a patrol officer in January 2011 but had since been promoted to detective. During his shift on January 5, 2011, Detective Baker was dispatched to the Defendant's residence after the dispatcher had received a call that the Defendant was making suicidal threats. On the way to the residence, Detective Baker was informed that the Defendant had threatened to commit suicide and that he was "talking" to a fifteen-year-old female who lived out of the state. Detective Baker said that he spoke with the Defendant, who informed him that he was not suicidal, and the detective asked the Defendant for his cell phone. The Defendant handed the officer his phone, and the officer looked to see if there were any text messages or communications between the Defendant and the fifteen-year-old girl from Pennsylvania. All of the text messages had been deleted.

Detective Baker testified that he asked Deputy Daniel to look at the phone for communications. While Deputy Daniel did so, Detective Baker spoke with the Defendant. Shortly thereafter, Deputy Daniel informed Detective Baker that he had found pornographic material on the phone that he believe depicted a minor or minors. Detective Baker asked the Defendant if he could take custody of the phone for further investigation, and the Defendant agreed. Detective Baker provided the Defendant a property receipt, and the Defendant signed the receipt.

During cross-examination, Detective Baker agreed that when he was dispatched he was informed that the Defendant had sent messages via the media site Facebook. The detective said that, when he asked the Defendant for his phone, he did not inform the Defendant why he wanted to see it. The detective also said that he never attempted to log onto the Defendant's Facebook account to check the Facebook messages.

Detective Dwayne Jackson, with the Humphreys County Sheriff's Department, testified that he went to the Defendant's house and interviewed him on January 7, 2011. At that time, the detective informed the Defendant that he was there because there were some questionable images on his phone that appeared to be pornography involving underage females. He explained the Defendant's rights to him, and the Defendant waived his rights and signed a document indicating the waiver. Detective Jackson testified that he asked the Defendant about the "Pennsylvania female" that he had allegedly been in contact with and about his alleged suicidal statement.

In a second interview, on January 14, 2011, the detective asked the Defendant for permission to search his phone, including any images, pictures, or memory contained on the phone, and the Defendant signed a document consenting to the search.

During the interviews, the Defendant made a written statement in which he discussed contacting a female via Facebook. He said that the two had been texting and that he had saved her telephone number. He offered the name of the female as A.H.[1] The Defendant informed the officer that he was "bored with adult pornography" and began looking at child pornography. Detective Jackson said that, after the interview, he took the Defendant's phone to the Dickson County Sheriff's Office for forensic analysis.

During cross-examination, the detective testified that he did not record this interview. He said that his department did not have access to that kind of equipment at the time.

Detective Scott Levasseur, with the Dickson County Sheriff's Office, testified as an

---

[1]For her privacy, we will refer to the minor depicted in the photographs by her initials only.

expert in the field of computer forensics. Detective Levasseur said that he was able to extract the SIM card and the micro SD card from the Defendant's phone and review the data stored on these components. He located 147 live image files on the memory card, most of which were of naked females that looked young but none were of minors. The detective said that there were teenage girls, aged fourteen to seventeen, who appeared older than their age. In order to avoid false prosecutions, he did not count these women and was using only prepubescent children.

Detective Levasseur testified that he recovered 427 deleted files, most of which were pornographic. The titles for those images indicated they were of children or teenagers, and some of the titles of the images were ones that he knew from his experience as belonging to pictures of underage children.

Detective Levasseur testified that he found two videos, one titled "Preteen Pedo," "Pedo" being short for pedophile. The whole title was "Preteen Pedo, PTHC, Vickie nine year old, early works, rare, beautiful, 24 minute, MPEG." This video showed a female child of about nine years of age being shown pornographic magazines by a nude adult male who then anally penetrated the child with his finger. He is then seen having the child masturbate his erect penis with her hands. He then performs oral sex upon her, and she upon him. There are several different clips of the man and child joined together to make a twenty-four minute video. The child in the video has been identified by the National Center for Missing and Exploited Children as "Vickie," and the man in the video is her father. Detective Levasseur said he had seen the same video in hundreds of other cases. It was part of a series of videos referred to by law enforcement as the "Vickie Series." That series has been traded extensively for years.

Detective Levasseur said that the second video the detective found was from Russia and depicted a young female child around eleven or twelve years old. The child was nude in bed with a younger female child and the man in the video masturbated the child with her fingers. The video was approximately thirty minutes in length. The detective was unable to recover the title of this video.

Detective Levasseur testified that he additionally found the titles of several deleted images, which indicated that they depicted an underage child. Several of these names he recognized as being of well known videos that contained child pornography. He found the name of a video called "Nine-Year-Old Jenny," which he said was one of a series of videos depicting a nine-year-old victim being abused by a family member. He also found the names of videos called "Seven-Year-Old Lolita" and "Eight-Year-Old Pussy." The videos had been deleted but the names remained on the SD card. The detective said that he found "hundreds of these file names" in the deleted space on the card.

Detective Levasseur testified that he did a second examination of the cell phone at the State's request. He unsuccessfully attempted to confirm the exact dates that the videos were downloaded. He then examined the cell phone a third time. He was asked to determine whether the SD card could have been purchased at a flea market and contained those images without the Defendant's knowledge. The detective said that the Defendant's memory card contained some pornographic pictures and also the Defendant's personal pictures of himself and his family. He found that, when the SD card was in the Defendant's phone, the Defendant would have had to scroll past the pornographic images to get to his personal images. Further, the pictures were saved to the Defendant's device in chronological order in which they were taken. Therefore, because there was pornography interspersed with his personal pictures, he determined they were saved at the time that the Defendant owned the SD card.

Detective Levasseur explained similarly that the videos were saved in a file created by the Defendant's cell phone and were in a folder on the Defendant's phone that also contained a picture of the Defendant and his son. This indicated to the detective that the Defendant had saved these videos. Further, the detective used new software to locate the Defendant's internet searches on his phone. The software revealed that the Defendant had searched for "child pornography" and "teenage pornography" on his phone.

The search of the Defendant's phone revealed that, on Thursday, December 30, 2010, at 10:16 a.m., the Defendant messaged someone privately stating, "Willing to pay 25 dollars per bra shot, and 50 per bra and panty shot, and a lot more for the other." He then offered his cell phone number.

The detective then showed the jury portions of the two videos he had found on the Defendant's phone, the one from the "Vickie Series" and the one depicting a Russian child.

During cross-examination, Detective Levasseur testified the he was unsure when the two videos were downloaded onto the phone. He said that these videos were in line with other pornography, internet searches, and Facebook messages contained on the phone and did not seem to be isolated aberrations that could have been downloaded to the Defendant's phone by a friend or co-worker borrowing the phone. The detective agreed that he was unaware of who else may have had access to the Defendant's phone. Detective Levasseur said that, of the two videos on the phone for which the Defendant was charged, only one of them had been "deleted."

The State elected the "Vickie Series" video as Count 1 and the other video as Count 2. The jury then convicted the Defendant for both counts of sexual exploitation of a minor. The trial court sentenced the Defendant to two years, at 30%, for each conviction and ordered

that the sentences run concurrently.

## II. Analysis

On appeal, the Defendant contends that the search of his phone exceeded his consent. He states that he believed the officers were only looking for suicidal messages on his phone and Facebook page and that by entering the media files, the officers exceeded the scope of this consent. The State counters that the Defendant consented to a search of his cell phone in order for the officers to determine whether he had sent messages threatening suicide. After discovering that his text messages had been deleted, the deputies looked in the Defendant's media file because data could be stored in various files on a cell phone. The Defendant, the State says, never limited or revoked his consent. Therefore, the trial court properly denied the Defendant's motion to suppress.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews de novo the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

Both the federal and state constitutions protect against unreasonable searches and seizures. The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Article I, section 7 of the Tennessee Constitution similarly guarantees "[t]hat the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures." "[U]nder both the federal constitution and our state constitution, a search without a warrant is presumptively unreasonable, and any evidence obtained pursuant to such a search is subject to suppression unless the state

demonstrates that the search was conducted under one of the narrowly defined exceptions to the warrant requirement." *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005). One of the established exceptions to the warrant requirement is consent to search. *State v. Bartram*, 925 S.W.2d 227, 230 (Tenn.1996).

*State v. Brown*, 294 S.W.3d 553, 561 (Tenn. 2009) (footnote omitted).

"For consent to pass 'constitutional muster,' it must be 'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" *State v. Cox*, 171 S.W.3d 174, 184 (Tenn. 2005) (quoting *State v. Simpson*, 968 S.W.2d 776, 784 (Tenn. 1998)). "'[T]he existence of consent and whether it was voluntarily given are questions of fact' which require examining the totality of the circumstances." *Id*. at 184-85 (quoting *State v. Ashworth*, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999)). When determining voluntariness, factors to consider include:

> (1) Time and place of the encounter; (2) Whether the encounter was in a public or secluded place; (3) The number of officers present; (4) The degree of hostility; (5) Whether weapons were displayed; (6) Whether consent was requested; and (7) Whether the consenter initiated contact with the police.

*Id*. at 185.

In this case, considering the totality of the circumstances, we conclude that the trial court correctly denied the Defendant's motion to suppress. Law enforcement officers responded to a call that the Defendant had threatened, via text or Facebook message, to commit suicide. They conducted a welfare check on the Defendant, who said he was not suicidal and was not being serious when he sent the message. The officers asked to see the Defendant's phone to ensure that the Defendant was not threatening suicide. The Defendant gave officers his phone and told them they could look at it. Deputy Baker looked at the phone and found the text messages deleted. Deputy Baker asked Deputy Daniel, in the presence of the Defendant, to look at the phone and see if he could find the messages. The Defendant said nothing. Deputy Daniel looked in a "media" folder for the text messages. In the folder, he found multiple pornographic pictures depicting what he believed to be minor girls. We agree with the trial court that the Defendant consented to having his phone searched and that he never canceled or revoked his consent. The Defendant is not entitled to relief.

The State points out that the Defendant was indicted for two counts of sexual exploitation of a minor, a Class D felony. The jury was instructed on this offense, as well as attempted sexual exploitation of a minor, and the jury returned a verdict of guilt as to the two counts listed in the indictment, finding the Defendant guilty of two counts of sexual

exploitation of a minor. The judgments of conviction contained in the record indicate that the Defendant was convicted of attempted sexual exploitation of a minor, a Class E felony. The applicable sentencing range for the Defendant for a Class D felony is between two and four years. T.C.A. § 40-35-112(a)(4). The applicable sentencing range for a Class E felony is one to two years. T.C.A. § 40-35-112(a)(4). During the sentencing hearing, the parties were discussing the Defendant's convictions for sexual exploitation of a minor and did not discuss "attempt." Because the Defendant's sentence is within the applicable range for the crimes of sexual exploitation of a minor, the judgments of conviction simply indicate the wrong crimes. We, therefore, remand the case to the trial court for entry of corrected judgment forms indicating convictions for sexual exploitation of a minor.

## II. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the trial court correctly denied the Defendant's motion to suppress. Accordingly, we affirm the trial court's judgments, and we remand the case to the trial court for the entry of corrected judgment forms as indicated above.

_____
ROBERT W. WEDEMEYER, JUDGE

-11-