IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 12, 2020

## STATE OF TENNESSEE v. MICHAEL EDWARD COHEN

**Appeal from the Criminal Court for Davidson County
No. 2018-B-1491     Jennifer Smith, Judge**

_____

### No. M2019-01122-CCA-R3-CD
_____

The Appellee, Michael Edward Cohen, was charged in the Davidson County Criminal Court with sexual exploitation of a minor involving more than one hundred images, a Class B felony.  He filed a motion to suppress evidence, arguing that he turned over the images to a police officer involuntarily after the officer threatened to obtain a search warrant for his residence when the officer did not have probable cause for a warrant.  The trial court held an evidentiary hearing and granted the motion, and the State appeals.  Based upon our review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Jeremy D. Johnston, Assistant District Attorney General, for the appellant, State of Tennessee.

David Denty Cheatham, Nashville, Tennessee, for the appellee, Michael Edward Cohen.

### OPINION

### I.  Factual Background

In June 2018, the Davidson County Grand Jury indicted the Appellee for sexual exploitation of a minor involving more than one hundred images.  The charge resulted from the Appellee's turning over materials to Detective Michael W. Adkins during Detective Adkins's visit to the Appellee's residence on May 31, 2018.

In November 2018, the Appellee filed a motion to suppress evidence, arguing that he involuntarily turned over the images to Detective Adkins because Detective Adkins threatened to obtain a search warrant for his home. The Appellee asserted that Detective Adkins did not have probable cause for a warrant and that the officer used "psychological techniques" and "deception" to convince him to turn over the images. The Appellee also argued that the officer effectively conducted a custodial interrogation without providing him with Miranda warnings. The State responded to the motion, arguing that the Appellee voluntarily consented to a search of his residence and that he was not in custody when he made incriminating statements to the officer.

On February 22, 2019, the trial court held a hearing on the motion. At the outset of the hearing, the parties advised the trial court that Detective Adkins audio-recorded his visit to the Appellee's residence on May 31, 2018, and that the recording was transcribed. The recording and the transcript were made exhibits to the hearing.

Detective Adkins of the Metropolitan Nashville Police Department (MNPD) testified at the suppression hearing that he worked in the police department's Sex Crimes Section and that his job included investigating internet crimes against children. In May 2018, Detective Adkins received a report filed by the Bellevue library. He said that according to the report, the library staff "had observed [a man] on one of the computers that was visiting inappropriate web sites and had printed out material that they felt was inappropriate. And they had turned in some of that material, which turned out to be stories of adults having sex with minor children." Detective Adkins said that the material did not include photographs of adults having sex with children but that "there were drawings, and stuff, of naked children associated with the stories." After the man left the library, a staff member went outside and recorded his vehicle's license tag number. At some point, the man returned to the library. A staff member met him at the door and told him that his library privileges had been suspended. The staff member talked with the man "for [a while] there," and the man identified himself as the Appellee.

Detective Adkins testified that he did not think he had probable cause for a search warrant of the Appellee's residence at that time because "[t]he stories and images were not criminal. They were concerning, [having to do] with adults having sex with children, but they were not criminal. And images that were in the stories, the drawings and stuff, were, again, were not criminal." Nevertheless, Detective Adkins thought he needed to talk with the Appellee.

Detective Adkins testified that about 11:00 a.m. on May 18, 2018, he went to the Appellee's condominium. He knocked on the door, and the Appellee answered. Detective Adkins identified himself and asked if he could come inside and talk with the Appellee. The Appellee responded that "it was messy," and Detective Adkins told him, "I [don't] mind about messy." Detective Adkins talked with the Appellee in the living room, which was just inside the front door. Detective Adkins wanted to remain standing for officer

- 2 -

safety, noting, "I was there by myself." He asked the Appellee if he could remain standing, and the Appellee said yes.

Detective Adkins acknowledged that during his conversation with the Appellee, the Appellee said that he had "some images of nude children." At that point, Detective Adkins thought he had probable cause to obtain a search warrant for the Appellee's residence. The Appellee offered to get the images for the officer. However, Detective Adkins needed to keep the Appellee in view for officer safety, so he told the Appellee, "'No. Wait. I need to see where you are.'" Detective Adkins never handcuffed the Appellee, never locked any door, and never restricted the Appellee's movements or freedom. The Appellee never attempted to leave, never asked to leave, and never asked Detective Adkins to leave or stop questioning him. Detective Adkins said that from his conversation with the Appellee, he learned the Appellee was a college graduate. He said he did not think the Appellee was a scientist but was "something like that."[1]

Detective Adkins testified that he accompanied the Appellee into his bedroom and that "the printed stories were around the room." A large, open trunk was beside the Appellee's bed. Detective Adkins asked to look inside the trunk, and the Appellee gave consent. Detective Adkins stated, "There were books and binders that had photographs in there, and other ones that had magazines in there, and things like that, and that's where we're searching." The Appellee did not appear to be intoxicated or in poor health, and Detective Adkins never threatened or abused him. The Appellee was not arrested that day but was arrested months later.

On cross-examination, Detective Adkins testified that he was about six feet tall while the Appellee was about five feet, three inches tall. When Detective Adkins entered the Appellee's residence, the Appellee invited him to sit down, but he declined. He denied "standing over" the Appellee. He said that the Appellee was sitting down during their conversation, that he stood "several feet back" from the Appellee, and that he told the Appellee that he was investigating an incident at the library. Detective Adkins acknowledged that he told the Appellee that the Appellee probably had been interested in twelve-year-old girls "for a long time." The Appellee admitted that he was sexually attracted to underage girls. Detective Adkins asked the Appellee about the images in the Appellee's home, and they discussed the legality of the images. Detective Adkins acknowledged telling the Appellee that the Appellee "needed to get rid of the stuff that he had, and that this wasn't good for him." Detective Adkins also acknowledged asking the Appellee, "'So where's the stories, and stuff, that you printed off?'" The Appellee responded, "'I should probably not show you right now.'" Detective Adkins wrote in his report that the Appellee initially refused to show him the materials.

---

[1] The record reflects that the Appellee was seventy-three years old and that he told the detective that he was a scientist in biomedical research.

On redirect examination, Detective Adkins testified that as soon as he thought he had probable cause for a search warrant, he explained the Appellee's options to the Appellee: (1) Grant consent for Detective Adkins to look at the materials or (2) Detective Adkins would "seize the scene" until he could obtain a search warrant. Detective Adkins said he would have "seized the scene" to protect the evidence.

On recross-examination, Detective Adkins testified that if he had "seized the scene," the Appellee would not have been detained in his home. He explained that an officer would have stayed at the Appellee's residence while he obtained the warrant in order to protect the evidence, not to detain the Appellee. Detective Adkins told the Appellee that he thought he had probable cause to obtain a warrant but also told the Appellee that a judge could deny his request for a warrant. When Detective Adkins told the Appellee that he thought he had probable cause for a search warrant, Detective Adkins did so based on his experience. He said that the Appellee was never under arrest, that the Appellee was free to leave, and that the Appellee "could have done whatever he wanted."

At the conclusion of the hearing, the trial court stated that it would listen to the recording and read the transcript. Therefore, a summary of the recording and the transcript is in order.

The evidence shows that after the Appellee answered the door, Detective Adkins introduced himself and asked if the Appellee would speak with him. The Appellee said that "I guess so" and invited the officer to sit down. Detective Adkins asked if he could remain standing, and the Appellee said, "Okay." Detective Adkins advised the Appellee that the Appellee was not under arrest and that "[i]f you want me to leave, you tell me to leave, and I'll leave. . . . You don't have to talk to me. You don't have to say anything." Detective Adkins told the Appellee that he wanted to talk with the Appellee about "some stories and things" that the Appellee had printed at the library and advised the Appellee that "[t]he stuff you did at the library, it's not criminal. . . . It's not illegal. Okay? Concerning, obviously, but not illegal." The officer noted that the Appellee had "printed off" a story about a twelve-year-old child having sex and that the Appellee had left the story on the printer at the library. The officer stated that "I'm guessing you have an issue that you're dealing with, an attraction to younger kids" and asked, "How long has this been a problem with you?" The Appellee responded, "A couple years, I guess. . . . [But] I've never touched a child, or been accused of touching a child, or anything like that."

Detective Adkins asked if the Appellee was sexually attracted to girls "[a]round 12 years old or so." The Appellee said yes but that he also was attracted to adult women. Detective Adkins asked the Appellee, "How do you deal with this [attraction]?" The Appellee said that "I read stuff" and that he "stumbled across" the stories he printed at the library. He said that he had lived in Nashville about one year and that he began printing the stories about five years ago when he lived in Baltimore. The Appellee did not own a computer, did not know much about computers, and printed the stories at libraries. He

acknowledged that the stories involved twelve- to thirteen-year-old girls having sex. He said that images "[o]ccasionally" accompanied the stories but that the images were "[j]ust nude images" and did not show the girls engaged in sex. The Appellee "never bothered" to search for images on the Bellevue library computers because he knew the computers were "filtered." The Appellee said that after he printed the stories, he read them and "toss[ed]" them. Detective Adkins asked if the Appellee had some of the stories "sitting around," and the Appellee responded, "Might have a few." The Appellee stated, though, that "[a]lmost none" of them contained images of underage girls. The Appellee described the images he printed at the Bellevue library as "fairly mild" and said he was "shocked" when the library "banned" him.

Detective Adkins told the Appellee, "I'd like to take a look at those old stories . . . . I'd like to see what they look like, and make sure that they're kind of the same thing that we're talking about here, and see if there's something else in here." Detective Adkins advised the Appellee that the stories "aren't helping your addiction either" and that "[y]ou need to purge yourself and get rid of all that stuff." Detective Adkins then asked, "So where's the stories and stuff that you printed off?" The Appellee responded, "I should probably not show you right now," and the following exchange occurred:

DETECTIVE ADKINS: Okay. Well, you don't -- you don't have to. That's perfectly within your right. But you can understand our concern about what's going on here.

MR. COHEN: Right.

DETECTIVE ADKINS: You know, this is not something that you need to be having in your house --

MR. COHEN: Right.

DETECTIVE ADKINS: -- Michael. This is a -- you have a sexual attraction to underage girls.

MR. COHEN: Right.

DETECTIVE ADKINS: You know, that's a problem. Okay? And I have to look at it and say, "Well, what's the best thing to do here? What's the best thing to do for Michael and get past this and get this done, and how can I make sure that I do my job correctly and do everything that I can do to make sure that, you know, Michael's not going to do something to a child and that he's not going to go on the Internet looking for underage girls' images and --

MR. COHEN:  I learned my lesson there.

DETECTIVE ADKINS:  Well, I -- I -- I think you learned something, but I don't know how much, because you don't seem to think the punishment fits the action.  You think that a ban is a little bit too harsh.  Uh, and now you've still got stories of kids having sex, and you've said there are several some of them that probably have pictures of underage girls on there that are nude.

Um, so I've got to look at it and say, "What -- what do I need to do?  What do I need to do to make sure that Michael's not doing something that he shouldn't do?  How do I know that Michael doesn't have a whole bunch of pictures of underage girls back in a bedroom, nude pictures that he printed out from here or there, or pictures of girls having sex that he has in there that he masturbates to?"  Um, if that's not the case, that's fine.  Um, but I have to sit here and go, "Well, can I trust Michael or not?"

If all you have is stories, that's perfectly fine.  It's legal.  I would strongly recommend you get rid of all that stuff.

MR. COHEN:  (Inaudible).

DETECTIVE ADKINS:  You don't need to have it.  But if you have pictures of underage girls, that's a different story.  That -- that's -- that's a different issue that we're dealing with and something that I have to think about and say, "What's -- "What's the best thing to do here?  I mean, should" --

MR. COHEN:  Well, I can show you the pictures I printed out.

. . . .

I don't have any -- those were drawings.  They weren't photographs I printed out.

DETECTIVE ADKINS:  Just drawings?  Okay.  Well, drawings aren't illegal.  Not helping you, but not illegal, not criminal.

Um, and I'd like to be able to verify that stuff.  Again, this is your house.  You don't have to give me consent.  You can tell me no.  That's perfectly fine.

And then I have to sit there and go, "Well, do I just need to call a patrol car out here, and have him sit here for a little while, and go downtown and get a search warrant for Michael's residence?"

And I don't really want to do that, because I don't want to have a patrol car out here, and I don't want to have him sitting in here in the house with you for a couple hours while I go downtown and --

MR. COHEN: So you will get a search warrant if I don't --

DETECTIVE ADKINS: Well, I -- yeah -- well, you've got a spider crawling on your stuff over here.

You know, I would be concerned about some of the stuff that you're doing. And I believe that you have probably printed out some images that you probably -- that you shouldn't have.

They may all be drawings. There may be some that aren't drawings. Uh, whether or not it would actually be considered child pornography or illegal, I'm not sure. I know you're right on the edge on the stuff that you printed out that day, but you've been going there for a while.

Do I feel that I have enough to get a search warrant? Yeah, I do. I believe that if I went and typed up a search warrant, and, um, showed it to a judge, they would probably grant me a search warrant for your house. Um, I don't want to do all that. I'll be honest with you. I don't want to waste your time and I don't want to waste my time.

Um, there's always the chance that the judge could tell me no, uh, he doesn't think you have enough probable cause. But you told me a little while ago that you printed off some pictures of some underage girls that were nude. Um, so that, in itself, should be enough to get a search warrant.

Um, I don't want to do that. I don't. If we can look at the stories real quickly, and there's nothing on there, nothing concerning, uh, fine, we're done. Um, I -- regardless of what we see, uh, and what you show me, I'm not here to arrest you now. Okay? I'm leaving, and you're staying here. Okay?

. . . .

If you have a whole bunch of images back there that you printed off for the last five or six years that you've been holding on to, Michael, you just

need to be honest with me and tell me about that. If that's the situation, then obviously you've got some issues, and we need to talk about that, and we need to figure out --

MR. COHEN: Well, my -- I do have others that were mainly nudist . . . sites. . . . No actual child pornography site.

DETECTIVE ADKINS: Okay. That you got from sites, nudist pictures?

MR. COHEN: Right.

DETECTIVE ADKINS: And these are the one that you printed off?

MR. COHEN: Right.

DETECTIVE ADKINS: Okay. Did you get those from the library or from somewhere else?

MR. COHEN: Somewhere else.

DETECTIVE ADKINS: Okay. Where would you go to get that stuff?

MR. COHEN: Uh, another library, [outside of Davidson County].

. . . .

DETECTIVE ADKINS: Okay. All right. How many pictures we talking about, Michael?

Mr. COHEN: I don't know. Maybe -- well, also I have books.

DETECTIVE ADKINS: Old -- old books?

MR. COHEN: Well, books I've bought from Amazon that are legitimate photographers.

DETECTIVE ADKINS: Okay. Nudist photographs --

MR. COHEN: Right.

. . . .

DETECTIVE ADKINS: Just because they're classified as nudist doesn't mean they're not illegal. Um, just because they use those sites and stuff doesn't mean that that's not illegal stuff.

. . . .

I would have to see them to be able to tell whether or not this is something that would be considered illegal or not. And, to be honest with you, it would have to be -- I -- I don't know. The books that you bought are probably right on the line. Um, as for the pictures and stuff that you've printed off the Internet, I don't know. I don't know. But I need to see them to be able to make an accurate decision.

And I can be honest. I'll tell you the 100 percent truth. No matter what I see, uh, you're not being arrested right now. You might not be arrested at all. You might. I don't know. Um, child pornography laws in Tennessee could be different than child pornography laws in Baltimore. Every state's different. Okay?

What I do know is that you have stories of children having sex, which aren't illegal; you have a sexual attraction to underage girls; and you have nude photographs that you've printed off from Baltimore and you brought down here to Nashville, and you still have those nude photographs. Some of them could be from nudist sites, but some of them could be other stuff as well.

Just because you're not engaged in sexual activity does not make it legal. Okay? A nude photograph of an underage child could be child pornography, based on the photograph. Okay?

And based on your sexual attraction to children, I'm assuming that some of the photographs are probably focused on the genitals or the breasts of the underage girls. Okay? But I can't make that decision without looking at the stuff, without seeing it. Okay?

So I have two options, basically, now -- well, you have two options. Okay? You can grant me consent, and we can sit down and take a look at these. . . .

MR. COHEN: Okay.

DETECTIVE ADKINS: . . . So you can give me consent, and we can take a look at those, or the other option is for me to call a patrol car out here --

MR. COHEN: Okay. You've got consent.

DETECTIVE ADKINS: Oh, okay.

MR. COHEN: It's not like I have a lot of choice.

DETECTIVE ADKINS: Well, you have a choice. I want to make sure you understand. You don't have to.

MR. COHEN: I don't have to, but you'll . . .

. . . .

DETECITVE ADKINS: Okay. These are all the stories and stuff that you've printed out?

MR. COHEN: Here are the pictures I've printed out right here.

Based on Detective Adkins's testimony at the suppression hearing, the audio-recording of his visit to the Appellee's home, and the transcript of that recording, the trial court entered an order granting the Appellee's motion to suppress. First, the trial court concluded that the Appellee's consent to search was involuntary. Specifically, the trial court stated as follows:

> After reviewing the totality of the circumstances, the Court concludes that the Defendant's consent came only after-- and as a direct result of-- Detective Adkins' threat to call in additional law enforcement to hold the [Appellee] in his home "for a couple of hours" while Detective Adkins sought a search warrant. The [Appellee's] consent to search was thus not a product of an "essentially free and unconstrained choice." [State v. Cox, 171 S.W.3d 174, 185 (Tenn. 2005) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973)]. Rather, it was granted only in submission to a claim of lawful authority. See also Bentley v. State, 552 S.W.2d 778 (Tenn. Crim. App. 1977) (consent which came only after a threat to obtain a warrant not a voluntary consent).

The trial court further concluded that Detective Adkins did not have probable cause when he threatened to seize the scene and obtain a warrant. The State appeals the ruling of the trial court.

## II. Analysis

### A. Jurisdiction

As an initial matter, the Appellee claims that this court lacks jurisdiction over the State's appeal because the State is appealing its entry of a nolle prosequi, which is not appealable under the Tennessee Rules of Appellate Procedure. The State responds that this court has jurisdiction. We agree with the State.

The trial court's order granting the Appellee's motion to suppress was filed on May 8, 2019. The court minutes for June 7, 2019, reflect that the assistant district attorney general, the Appellee, and trial counsel appeared in court and that "the attorney general with the assent of the court entered a nolle prosequi herein without costs." That same day, the trial court entered an order, providing as follows:

> This cause came to be heard on the 7th day of June 2019 at the request of the State of Tennessee. Upon its statement that there is, at present, insufficient evidence for this matter to go forward to trial the State of Tennessee has entered a nolle prosequi in this matter.
>
> **IT IS**, therefore, **ORDERED, ADJUDGED** and **DECREED** that the State of Tennessee has entered a nolle prosequi in this matter.

The State filed a timely notice of appeal, "appeal[ing] the order of the Davidson County Criminal Court entered on June 7, 2019, granting a nolle prosequi for the charge of possessing child pornography against the appellee, Michael Cohen."

The Appellee contends that the entry of a nolle prosequi is a voluntary act by the State for which there is no appeal under Tennessee Rule of Appellate Procedure Rule 3. Rule 3(c), Tennessee Rules of Appellate Procedure, provides that an appeal by the State "lies only from an order or judgment entered by a trial court from which an appeal lies to the Supreme Court or Court of Criminal Appeals: (1) the substantive effect of which results in dismissing an indictment, information, or complaint[.]" As this court has explained,

> Whether a pending criminal case is to be discontinued or dismissed upon an order Nolle prosequi is a matter addressed to the judgment of the District Attorney General and the court in which the case is then pending. That is, a Nolle prosequi can be awarded only by the Attorney General and the court. Scheibler v. Steinburg, 129 Tenn. 614, 617, 167 S.W. 866 [(Tenn. 1914)]. A Nolle prosequi is a formal entry upon the record, by the plaintiff in a civil suit or the prosecuting officer in a criminal action, by which he declares that he will not further prosecute the case, either as to some of the

counts, or some of the defendants, or altogether.  State ex rel. Underwood v. Brown, 193 Tenn. 113, 244 S.W.2d 168 [(Tenn. 1951)].

State v. D'Anna, 506 S.W.2d 200, 202 (Tenn. Crim. App. 1973).

Granted, "the entry of a nolle prosequi is not one of the specifically enumerated circumstances upon which an appeal as of right is available to the State."  State v. Larry Mitchell Brooks, No. M2013-00866-CCA-R3CD, 2014 WL 2567135, at *3 (Tenn. Crim. App. at Nashville, June 6, 2014).  However, a trial court's entry of an order of nolle prosequi results in the substantive effect of dismissing the indictment against Appellee, allowing the State to appeal as of right under Tennessee Rule of Appellate Procedure 3(c). Id. at *4.

Here, the court minutes for June 7, 2019, state that the "the attorney general with the assent of the court entered a nolle prosequi."  That same day, the trial court entered an order providing that "the State of Tennessee has entered a nolle prosequi in this matter." Although poorly worded, the June 7 order reflects that the trial court and the State properly entered a nolle prosequi.  Therefore, we conclude that we have jurisdiction over this case. See id. (noting that this court allowed an appeal by the State after an order of nolle prosequi in State v. Wade Allen Willis, No. M2012-0157-CCA-R3-CD, 2013 WL 1645740, at *4 (Tenn. Crim. App. at Nashville, Apr. 17, 2013), and in State v. Jerry R. Shouse, No. M2013-00863-CCA-R3-CD, 2014 WL 1572451, at *3 (Tenn. Crim. App. at Nashville, Apr. 21, 2014)).

B.  Motion to Suppress

The State claims that the trial court erred by granting the motion to suppress.  First, the State contends that Detective Adkins developed probable cause to believe the Appellee possessed child pornography from the library staff's report that the Appellee printed drawings of children engaged in sexual activity with adults, the Appellee's admission that he was sexually attracted to underage girls, and the Appellee's statement that he possessed "photographs" of nude girls.  The State next claims that because Detective Adkins had probable cause, his statement that he was going to secure the scene while he obtained a search warrant was not a "baseless threat" that rendered the Appellee's consent to search involuntary.  The Appellee argues that the trial court did not err in finding that his consent to search was involuntary and that the officer did not have probable cause.  We agree with the Appellee.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact."  State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).  Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise."

- 12 -

Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the Appellee, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures." Generally, a warrantless search is considered presumptively unreasonable and, thus, violative of constitutional protections. See State v. Walker, 12 S.W.3d 460, 467 (Tenn. 2000). However, "one of the exceptions to the warrant requirement is a search conducted pursuant to consent." State v. Bartram, 925 S.W.2d 227, 230 (Tenn. 1996) (citing Schneckloth, 412 U.S. at 219, and State v. Jackson, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993)). "The sufficiency of consent depends largely upon the facts and circumstances in a particular case." Jackson, 889 S.W.2d at 221. Whether consent exists and "'whether it was voluntarily given are questions of fact.'" State v. Ashworth, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999) (quoting State v. McMahan, 650 S.W.2d 383, 386 (Tenn. Crim. App. 1983)). The prosecution bears the burden of proving that the defendant freely and voluntarily gave consent. See McMahan, 650 S.W.2d at 386.

As this court has explained,

Factors to consider in determining whether consent is voluntary include the time and place of the encounter, whether the encounter was in a public or secluded place, the number of officers involved, the degree of hostility during the incident, whether weapons were displayed, whether consent was requested, and whether the consenter initiated contact with the police. [State v. Cox, 171 S.W.3d 174, 185 (Tenn. 2005)]. In addition, an individual's "age, education, intelligence, knowledge, maturity, sophistication, experience, prior contact with law enforcement personnel, and prior cooperation or refusal to cooperate with law enforcement personnel" are relevant in determining whether consent is voluntary. Id. (internal quotation marks omitted). Also, proof including, but not limited to, evidence regarding the defendant's physical condition and the adverse effects of medications on a defendant's judgment and reasoning may establish that a defendant lacks the capacity to voluntarily consent. Cf. [State v. Reynolds, 504 S.W.3d 283, 309 (Tenn. 2016)]. Finally, . . . an individual's "'[k]nowledge of the right to refuse consent'" is also a factor in determining the voluntariness of consent. Id. at 307 (quoting Schneckloth, 412 U.S. at 235-47).

State v. Henry, 539 S.W.3d 223, 241-42 (Tenn. Crim. App. 2017).

Search warrants must be based on probable cause, which has been defined as "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." State v. Henning, 975 S.W.3d 290, 294 (Tenn. 1998). Generally, "[b]aseless threats to obtain a search warrant may render consent involuntary." United States v. White, 979 F.2d 539, 542 (7th Cir. 1992); see also Ashworth, 3 S.W.3d at 30. However, if the threat to obtain a search warrant is not baseless, that is, if police have probable cause to obtain a search warrant, the threat does not render consent to search involuntary. See Simmons v. State, 360 S.W.2d 10, 12 (Tenn. 1962).

The Tennessee Protection of Children Against Sexual Exploitation Act of 1990, "criminalizes, among other things, the possession, distribution, and production of child pornography." State v. Whited, 506 S.W.3d 416, 427 (Tenn. 2016) (citing Tenn. Code Ann. 39-17-1001 to -1008). "Basic possession [of child pornography] is charged as 'sexual exploitation.'" Id. Tennessee Code Annotated section 39-17-1003(a) defines sexual exploitation of a minor as knowingly possessing material that includes a minor engaged in sexual activity or simulated activity that is patently offensive. Although Detective Adkins apparently thought drawings could not be "criminal," Tennessee Code Annotated section 39-17-1002(2) defines "material" as "[a]ny picture, drawing, photograph, undeveloped film or film negative, motion picture film, videocassette tape or other pictorial representation[.]" Ordinarily, sexual exploitation of a minor is a Class D felony. Tenn. Code Ann. § 39-17-1003(d). If the number of individual images exceeds one hundred, though, the offense is a Class B felony. Tenn. Code Ann. § 39-17-1003(d).

Turning to the instant case, the trial court found that the Appellee's consent to search was involuntary because his consent was a result of Detective Adkins's "threat to call in additional law enforcement to hold the [Appellee] in his home for a couple of hours while the [detective] sought a search warrant." In doing so, the court addressed the "personal characteristics" of the Appellee, noting that he was a college graduate and a scientist. However, the court also noted that he was "an older man of relatively short stature," that he had lived in Nashville one year at the time of his interview with Detective Adkins," and that he "apparently lived alone and did not own a personal computer." The trial court stated that in listening to the audio-recording, the court heard the Appellee's "tone of voice" and his responses to Detective Adkins's questions and that nothing suggested the Appellee was familiar with the criminal justice system. The court stated that the officer's demeanor and treatment of the Appellee was "at all times polite and courteous" but that "underlying his pleasant persona was a persistent yet subtle determination to press the [Appellee's] apparent naivete and gain access to the materials he sought." The trial court rejected the Appellee's claim that Detective Adkins used "'psychological techniques'" and "'deception'" to coerce the Appellee but said that "Detective Adkins' specific assignment was child pornography, and his entire focus during the interview was just that."

The trial court recounted that during the interview, the Appellee told Detective Adkins that he had printed stories about underage girls having sex and that the stories

occasionally were accompanied by "'nude images' or drawings of girls." The Appellee denied that the images depicted girls "'engaging in sex.'" The trial court then noted as follows: When the officer asked to see the images, the Appellee declined consent. At that point, Detective Adkins told the Appellee that he was going to call a patrol car to the Appellee's residence while the officer went downtown to get a search warrant. The Appellee told the officer, "Okay. You've got consent. . . . It's not like I have a lot of choice." When Detective Adkins stated that the Appellee did have a choice, the Appellee responded, "I don't have to, but you'll . . . ."

The trial court had the opportunity to view the demeanor of the witnesses and hear the in-court testimony and was in the best position to weigh the evidence and assess the witnesses' credibility. We conclude that the evidence does not preponderate against the trial court's finding that the Appellee's consent was involuntary.

The trial court further concluded that Detective Adkins did not have probable cause when he threatened to seize the scene and obtain a warrant. The trial court found that Detective Adkins "readily conceded" that he did not have probable cause when he went to the Appellee's home. The trial court also found that Detective Adkins learned only from his conversation with the Appellee that the Appellee "may have had drawings and some images of nudity," which also did not establish probable cause. We agree with the trial court. Detective Adkins testified that the stories and images the Appellee printed at the library were "concerning but not criminal." Moreover, Detective Adkins acknowledged that he thought he had probable cause to obtain a search warrant when the Appellee stated that the Appellee had "some images of nude children." However, mere nudity of children, without more, is insufficient to establish the crime of sexual exploitation of a minor. State v. Whited, 506 S.W.3d 416, 431 (Tenn. 2016). Mere nudity of children also does not establish probable cause for a search warrant. United States v. Thomas Joel Wagner, No. 4:13-CR-32, 2015 WL 3627007, at *7 (E.D. Tenn. June 9, 2015); United States v. Doyle, 650 F.3d 460, 474 (4th Cir. 2011).

In support of its argument that the trial court erred, the State relies on State v. Anthony T. Tollis, No. E2018-01695-CCA-R3-CD, 2019 WL 4071980, at *1 (Tenn. Crim. App. at Knoxville, Aug. 29, 2019), perm. app. denied, (Tenn. Dec. 6, 2019), in which the police obtained a search warrant for the defendant's computer and found sexual images of minors. Much of the information contained in the affidavit in support of the search warrant was provided by the defendant's nephew, who had visited the defendant in the defendant's home. Id. During the visit, the defendant made statements about wanting to fulfill his fantasy of being with a teenage girl. Id. The next morning, the defendant's nephew searched the defendant's computer and found folders with the first and last names of individuals. Id. He opened one of the folders and saw "selfies" taken by a girl who appeared to be more than fourteen but less than eighteen years old. Id. The photographs showed the girl clothed, fully nude, and topless. Id. The defendant's nephew also found messages in the folders, and one of the messages asked, "'Do you have any pictures of

- 15 -

yourself when you were younger[?]'" Id. The defendant pled nolo contendere to sexual exploitation of a minor but reserved a certified question of law as to whether the information contained in an affidavit established probable cause. Id. at *2. This court upheld the trial court's finding of probable cause, explaining,

> The affidavit states that the informant observed photographs on the Defendant's computer which he believed to be of nude underage females. He provided the names of the females listed in the computer. He described messages that appeared to be sent from the Defendant to the females, asking to see more photos of them when they were younger. This is sufficient information to give investigators probable cause to believe that evidence of a crime, at a minimum the possession of child pornography, was contained on the Defendant's computer. The fact of whether "sexual activity," an element of sexual exploitation of a child which the Defendant ultimately pleaded guilty to, was occurring or had occurred was not essential to establishing probable cause for issuance of the search warrant.

Id. at *4 (footnote omitted).

The present case is distinguishable from Anthony T. Tollis. Again, the stories and drawings the Appellee printed at the library did not establish probable cause to believe he possessed child pornography. The Appellee's telling Detective Adkins that he possessed images of nude children also did not establish probable cause. We note that although the State contends that the Appellee said he printed "photographs" of nude children, the Appellee denied printing any photographs. Without more, we cannot conclude, as this court concluded in Anthony T. Tollis, that Detective Adkins had probable cause to believe that the Appellee possessed child pornography. Therefore, the evidence also does not preponderate against the trial court's finding that Detective Adkins lacked probable cause when he threatened to seize the scene and obtain a search warrant.

As to the Appellee's claim that his statements to Detective Adkins must be suppressed because Detective Adkins effectively conducted a custodial interrogation without providing him with Miranda warnings, defense counsel advised the trial court at the conclusion of the suppression hearing that he was not going to make any arguments about the issue and that the trial court did not need to address the issue if the trial court granted the Appellee's motion to suppress evidence. Accordingly, the trial court did not address the issue in its order. As noted by the State, appellate courts generally do not review issues not presented to or dealt with by the trial court." State v. Frank Lee Tate, No. W2004-01041-CCA-R3-CD, 2007 WL 570555, at *16 (Tenn. Crim. App. at Jackson, Feb. 23, 2007). Thus, we conclude that the issue has been waived. Id.

### III. Conclusion

Based upon the record and the parties' briefs, we conclude that the trial court did not err by granting the Appellee's motion to suppress evidence. Accordingly, the judgment of the trial court is affirmed.

_____
NORMA MCGEE OGLE, JUDGE